PAUL J. ANDRE (State Bar No. 196585)
pandre@kramerlevin.com
LISA KOBIALKA (State Bar No. 191404)
lkobialka@kramerlevin.com
JAMES HANNAH (State Bar No. 237978)
jhannah@kramerlevin.com
HANNAH LEE (State Bar No. 253197)
hlee@kramerlevin.com
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
990 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 752-1700
Facsimile:  (650) 752-1800

*Attorneys for Plaintiff*
FINJAN, INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation,<br><br>            Plaintiff,<br><br>       v.<br><br>BLUE COAT SYSTEMS, LLC, a Delaware Corporation,<br><br>            Defendant. | Case No.: 15-cv-3295-BLF-SVK<br><br>**PLAINTIFF FINJAN, INC.'S OPPOSITION TO BLUE COAT'S RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................... 1

II.   FINJAN PRESENTED SUBSTANTIAL EVIDENCE OF BLUE COAT'S
      INFRINGEMENT OF THE ASSERTED CLAIMS ................................................ 1

      A.    Finjan Presented Substantial Evidence That Blue Coat Infringes, Literally
            and Under the Doctrine of Equivalents, Claim 15 of the '844 Patent. ........... 1

      B.    Finjan Presented Substantial Evidence That Blue Coat Infringes, Literally
            and Under The Doctrine of Equivalents, Claim 10 of the '494 Patent. .......... 4

      C.    Finjan Presented Substantial Evidence That Blue Coat Infringes, Literally
            and Under The Doctrine of Equivalents, Claim 1 of the '731 Patent ............. 5

      D.    Finjan Presented Substantial Evidence That Blue Coat Infringes, Literally
            and Under The Doctrine of Equivalents, Claim 1 of the '968 Patent ............. 6

      E.    Finjan Presented Substantial Evidence That Blue Coat Infringes Claim 22
            of the '408 Patent. ......................................................................................... 7

      F.    Finjan Presented Substantial Evidence That Blue Coat Infringes, Literally
            and Under The Doctrine of Equivalents, Claims 1 and 10 of the '621
            Patent. ........................................................................................................... 9

      G.    Finjan Presented Substantial Evidence That Blue Coat Infringes The '844,
            '494, '731, '968 and '621 Patents Under The Doctrine of Equivalents. ....... 10

III.  FINJAN PRESENTED SUBSTANTIAL EVIDENCE OF BLUE COAT'S WILLFUL
      INFRINGEMENT ................................................................................................. 11

IV.   FINJAN PRESENTED SUBSTANTIAL EVIDENCE SUPPORTING DAMAGES
      FOR BLUE COAT'S INFRINGEMENT OF THE ASSERTED CLAIMS ............ 12

      A.    Finjan Presented Substantial Evidence to Support Damages Based on
            Worldwide Users of GIN. ............................................................................ 12

      B.    Blue Coat Failed to Present Substantial Evidence of Government Sales. ...... 15

      C.    Finjan Presented Substantial Evidence to Support an Award of Reasonable
            Royalties. ..................................................................................................... 16

V.    CONCLUSION ..................................................................................................... 22

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)          CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell v. Clackamus County*,
341 F.3d 858 (9th Cir. 2003) ............................................................................................. 1

*Card-Monroe Corp. v. Tuftco Corp.*,
No. 1:14-cv-292, 2017 WL 3841878 (E.D. Tenn. Sept. 1, 2017).................................... 13

*CNET Networks, Inc. v. Etilize, Inc.*,
528 F. Supp. 2d 985 (N.D. Cal. 2007) ....................................................................... 12, 14

*Erie Eng'd Prods., Inc. v. Wayne Integrated Techs., Corp.*,
No. CV 03-3776, 2005 WL 6582921 (E.D.N.Y. July 29, 2005) .................................... 15

*Goulds' Mfg. Co. v. Cowing*,
105 U.S. 253 (1881) ........................................................................................................ 13

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010), *aff'd* 564 U.S. 91 (2011) ............................................... 12

*Informatica Corp. v. Business Objects Data Integration, Inc.*,
No. C 02-03378 EDL, 2007 WL 2344962 (N.D. Cal. Aug. 16, 2007)............................. 1

*Larson v. U.S.*,
26 Cl. Ct. 365 (1992) ...................................................................................................... 15

*Microsoft Corp. v. AT&T Corp.*,
127 S.Ct. 1746 (2007) ............................................................................................... 13, 14

*NTP, Inc. v. Research In Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005)....................................................................................... 14

*Parker Beach Restoration, Inc. v. U.S.*,
58 Fed. Cl. 126 (2003) .................................................................................................... 15

*Railroad Dynamics, Inc. v. A. Stuki Co.*,
727 F.2d 1506 (Fed. Cir. 1984)....................................................................................... 13

*Sevenson Envtl. Servs., Inc. v. Shaw Envtl., Inc.*,
477 F.3d 1361 (Fed. Cir. 2007)....................................................................................... 15

*Stryker Corp. v. Zimmer, Inc.*,
837 F.3d 1268 (Fed. Cir. 2016)....................................................................................... 12

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)          CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

**Statutes**

28 U.S.C. § 1498 ............................................................................................................... 15

35 U.S.C. § 271(f) .............................................................................................................. 14

35 U.S.C. § 284 .................................................................................................................. 16

**Other Authorities**

Federal Rule of Civil Procedure Rule 50(a) ....................................................... 1, 11, 15, 22

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)          CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

# I.     INTRODUCTION

Finjan, Inc. ("Finjan") presented substantial evidence to support its claims of infringement and damages during its case, including sworn testimony on the stand from numerous fact and expert witnesses, deposition testimony of Blue Coat Systems LLC's ("Blue Coat") employees, source code testing of the accused products, and numerous Finjan and Blue Coat documents that were admitted into evidence. Blue Coat disagrees with the evidence that Finjan presented in its case, but its disagreement is not enough to prove that "as a matter of law" Finjan did not present substantial evidence to support its claims. Under Federal Rule of Civil Procedure Rule 50(a), when the evidence is viewed "in the light most favorable" to Finjan and "all reasonable inferences" are drawn in its favor, the Court should deny Blue Coat's  motion for judgment as a matter of law ("Motion"). *Bell v. Clackamus County*, 341 F.3d 858, 865 (9th Cir. 2003); *Informatica Corp. v. Business Objects Data Integration, Inc.*, No. C 02-03378 EDL, 2007 WL 2344962, at *1 (N.D. Cal. Aug. 16, 2007).[1]

# II.     FINJAN PRESENTED SUBSTANTIAL EVIDENCE OF BLUE COAT'S INFRINGEMENT OF THE ASSERTED CLAIMS

## A.     Finjan Presented Substantial Evidence That Blue Coat Infringes, Literally and Under the Doctrine of Equivalents, Claim 15 of the '844 Patent.

Finjan presented substantial evidence that Blue Coat is liable for infringement of Claim 15 of the '844 Patent, both literally and under the doctrine of equivalents. *See generally* Trial Tr. at 469:16-539:9, 560:9-23, 565:14-591:9, 603:18-605:11; PTX-49; PTX-105; PTX-211; PTX-216; PTX-290; PTX-295; PTX-368; PTX-423; PTX-427; PTX-499; PTX-516; PTX-564; PTX-575; PTX-1025; PTX-1274; JTX-3001; JTX-3043; JTX-3050; and JTX-3060. Blue Coat's assertions otherwise lack merit.

*First*, Finjan presented substantial evidence that Blue Coat's accused GIN/WebPulse product generates a Downloadable security profile in accordance with the Court's claim construction. Trial Tr. at 514:18-515:3, 517:11-537:13. Dr. Cole supported his opinion that GIN/WebPulse generates a Downloadable security profile that "identifies code in the received Downloadable that performs hostile or potentially hostile operations" with substantial evidence, including the testimony of Blue Coat

---

[1] Finjan incorporates by reference the arguments and evidence set forth in its (i) Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(a) (Dkt. No. 423) and (ii) oral opposition to Blue Coat's motion for JMOL regarding doctrine of equivalents.

engineers and multiple Blue Coat documents.  Trial Tr. at 518:3-519:12 (citing deposition testimony of Blue Coat's engineer, Mr. Andersen); PTX368 (Blue Coat's MAA Center Guide "so Blue Coat's own document is showing you that it generates, it looks for and attracts these suspicious operations which forms [sic] the security profile . . . the suspicious operations map back to the code that actually performs those suspicious functions" (*see* Trial Tr. at 519:13-521:16)); PTX564 (describing Dr. Cole's testing of the MAA and the summary that the MAA generated discussing suspicious operations, including "contains compressed section of code" (*see* Trail Tr. at 521:17-522:24)); PTX499 (describing static analysis of code and creation of security profile (*see* Trial Tr. at 423:12-425:15)); PTX-1025 at 862 (source code describing the suspicious code and operations identified in the security profile (*see* Trial Tr. at 525:16-527:7)); PTX-427 (MAA Report showing security profile with list of suspicious operations and code (*see* Trial Tr. at 527:9-529:8)).  Dr. Cole identified specific examples of the specific code identified, such as obfuscated Javascript: Eval method, JavaScript: from CharCode method; malware-specific code, Javascript: Unescape function (PTX-575) and identified in Blue Coat's source code where GIN identifies code within PDFs (PTX-1025; PTX-427).

Blue Coat's entire argument is premised on its improper misquotation of the trial transcript, wherein Blue Coat omits the portions of Dr. Cole's trial testimony where he explains that suspicious code and suspicious operations are not the same thing, but rather that "suspicious operations map back to the code that actually performs those suspicious operations." Trial Tr. at 521:11-16; *see also* Trial Tr. at 582:13-25 ("Q. So then you opinion is that suspicious operations and suspicious code are the same thing; right?  A.  No.  Suspicious operations are produced by suspicious code  Q.  So you recognize that there's a difference between suspicious operations and suspicious code; right?  A.  Yes, but they're both relating to doing the same operations.  So if I go in and read a file or do obfuscation, there could be different code that does that, but that code [] represents that's a suspicious operation").

In addition, Blue Coat failed to rebut the evidence Finjan presented.  Blue Coat's non-infringement expert, Dr. Nielson admits that MAA generates reports that identify suspicious operations, functions, and behavior, but simply disagrees that identifying behavior is not the same as identifying code.  Trial Tr. at 1618:16-18, 1626:8-11.  On cross-examination, however, Dr. Nielson

2

admitted that MAA does identify code, including Javascript Unescape and Eval code, and admitted that Dr. Cole went through his testing and identified where in Blue Coat's source code he located the exact code functions he testified about.  Trial Tr. at 1770:11-1771:16, 1772:4-10, 1772:23-1773:1.  Thus, Finjan presented substantial and unrebutted evidence that Blue Coat's GIN/WebPulse product satisfies this limitation of Claim 15 of the '844 Patent.

*Second*, Finjan presented substantial evidence—including expert testimony from Dr. Cole, Blue Coat documents and source code, and product testing—that Blue Coat's accused GIN/WebPulse product performs the limitation of "*linking the first Downloadable security profile to the Downloadable before a web server makes the Downloadable available to web clients*."  *See e.g.*, PTX-564 ("the way [linking] is done is by taking a fingerprint or a cryptographic hash of that file which both SHA and MD5 are hashes, and that's linking those together.  So that has now links that downloadable to that security profile" (*see* Trial Tr. at 522:2-523:7)); PTX-427 (MAA Report showing linking hashes to the Downloadable (*see* Trial Tr. at 527:13-528:8)); Trial Tr. at 528:9-529:8 (explaining operation of Blue Coat's MAA engines, FRS service and dynamo database and how security profile is linked before Downloadable made available to web client); JTX-3050 (architectural document demonstrating that FRS queries the Dynamo database that was populated by the MAA's in order to make a decision before the web content is made available to the client" (*see* Trial Tr. at 529:9-530:17)); PTX-49 (discussing blocking of threats before they reach the client computer (*see* Trial Tr. at 532:19-533:25); Trial Tr. at 532:19-533:25 (Dr. Cole's product testing confirmed content blocked before it was made available to the client); PTX-423 ("real-time decision" means decision regarding content made as the content comes in in real time and before the content is made available to a client (*see* Trial Tr. at 534:1-535:11).  Blue Coat failed to rebut the substantial evidence Finjan presented regarding this limitation.   Blue Coat's non-infringement expert, Dr. Nielson, simply disagreed with Dr. Cole, but did not mark a single document to support his opinion that this limitation is not met.

Finally, Finjan presented substantial evidence that Blue Coat's accused GIN/WebPulse product infringes Claim 15 of the 844 Patent under the doctrine of equivalents (as described below).

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)          CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

### B.   Finjan Presented Substantial Evidence That Blue Coat Infringes, Literally and Under The Doctrine of Equivalents, Claim 10 of the '494 Patent.

Finjan presented substantial evidence that Blue Coat is liable for infringement of Claim 10 of the '494 Patent, both literally and under the doctrine of equivalents.  *See generally* Trial Tr. at 469:16–496:21, 540:18–560:8, 565:14-605:11; PTX-49; PTX-105; PTX-211; PTX-216; PTX-290; PTX-295; PTX-368; PTX-423; PTX-427; PTX-499; PTX-516; PTX-564; PTX-575; PTX-1025; JTX-3001; JTX-3043; JTX-3050; JTX-3060.

Finjan presented substantial evidence demonstrating that GIN/WebPulse satisfies Element 2 of Claim 10 of the '494 Patent, which is the only limitation Blue Coat disputes, requiring "*a Downloadable scanner coupled with said receiver, for deriving security profile data for the Downloadable, including a list of suspicious computer operations that may be attempted by the Downloadable*."  Finjan presented substantial evidence—including expert testimony from Dr. Cole, Blue Coat documents and Blue Coat source code— that GIN/WebPulse contains a scanner for deriving security profile information from downloadables, including a list of suspicious operations.  Trial Tr. at 546:14-552:17; PTX-211 (showing that YARA looks for suspicious operations (*see* Trial Tr. at 546:23-548:6)); PTX-516 (YARA rules source code confirming YARA looks for suspicious operations such as Javascript obfuscation and identifies the specific code and operations being looked for (*see* Trial Tr. at 548:12-550:21)); JTX-3060 (Cookie2 security profile with list of all suspicious operations found within a file and concatenated string of the labels of the YARA rules that were fired (*see* Trial Tr. at 550:22-552:17)).  Thus, contrary to Blue Coat's assertion, Finjan presented substantial evidence identifying where in the YARA rules operations and code were identified, for example VBS_create rules and code (PTX-516); identification of riles that identify code and operations (PTX-516); where operations of Javascript inject code into the system (PTX-516); and Javascript obfuscation and associated code (PTX-516).

Blue Coat's non-infringement expert, Dr. Nielson, failed to offer a single document to support his disagreement with the substantial evidence Finjan offered.  Moreover, on cross-examination,  Dr. Nielson conceded that functions such as Javascript eval, among others, are suspicious operations.  Trial

---

4

Tr. at 1770:12-21.  He further admitted that evidence of Javascript eval or unescape operations is evidence that there was also Javascript eval  or unescape code.  Trial Tr. at 1771:14-16; 1772:8-14.

Finally, Finjan presented substantial evidence that Blue Coat's accused GIN/WebPulse product combination infringes Claim 10 of the '494 Patent under the doctrine of equivalents (as described below).

### C.   Finjan Presented Substantial Evidence That Blue Coat Infringes, Literally and Under The Doctrine of Equivalents, Claim 1 of the '731 Patent

Finjan presented substantial evidence that Blue Coat is liable for infringement of Claim 1 of the '731 Patent, both literally and under the doctrine of equivalents.  *See generally* Trial Tr. at 618:8-24, 624:21-24, 625:19-640:19, 640:20-647:3, 640:20-737:11; JTX-3003; PTX-360; JTX-3003; JTX-3048; JTX-3120; PTX-575; PTX-426; PTX-1025 at 1215; PTX-1025 at 1036; PTX-1025 at 1355; PTX-352; JTX-3037; PTX-426; PTX-295; PTX-1025 at 530; PTX-1025 at 1795; PTX-1025 at 2252-53; PTX-565; PTX-579; PTX-563; PTX-331.

Blue Coat only disputes the security policy cache limitation of Element 4 of Claim 1 of the '731 Patent.  Finjan presented substantial evidence—including Blue Coat documents, source code, witness testimony, expert testimony and testing of the Accused Products—demonstrating that Blue Coat's ASG with MAA combination contain the required "*security policy cache for storing security policies for intranet computers within the intranet, the security policies each including a list of restrictions for files that are transmitted to a corresponding subset of the intranet computers.*"  In particular, Finjan presented evidence that the ASG's security policy cache is the policy repository or policy container in the ASG.  Trial Tr. at 727:9-734:4, 735:4-737:11; PTX-565; PTX-579; PTX-563; PTX-331; PTX-1278; *see also generally* Trial Tr. at 618:8-24, 624:21-24, 625:19-640:19, 640:20-737:11.  Contrary to Blue Coat's assertion, Dr. Mitzenmacher specifically testified regarding his testing of the accused ASG with MAA products and how it demonstrated the installation process that compiles a security policy file and places it into a security file cache.  Trial Tr. at 728:13-734:4.  In addition to presenting Blue Coat documents to support his opinion (*see, e.g.,* PTX-579; PTX-331), Dr. Mitzenmacher also presented the testimony of Blue Coat's engineer, Mr. Maxted, that refers to the

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)          CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

policy repository and the storage of administrator-written policies that can be used at run-time.  Trial Tr. at 733:7-19.  Blue Coat challenged only Element 4 of Claim 1 of the '731 Patent with nothing but the unsupported opinion of Dr. Nielson, who did not cite any exhibits, witness testimony, source code or product testing to support his opinion.

Finally, Finjan presented substantial evidence that Blue Coat's accused ASG with MAA product combination infringes Claim 1 of the '731 Patent under the doctrine of equivalents (as described below).

### D.   Finjan Presented Substantial Evidence That Blue Coat Infringes, Literally and Under The Doctrine of Equivalents, Claim 1 of the '968 Patent

Finjan presented substantial evidence that Blue Coat is liable for infringement of Claim 1 of the '968 Patent, both literally and under the doctrine of equivalents.  *See generally* Trial Tr. at 738:17-760:17; JTX-3002; JTX-3037; PTX-522; JTX-3036; PTX-3048; PTX-571; PTX-563; PTX-1025 at 1650.  There is no merit to Blue Coat's argument that Finjan failed to present substantial evidence that Blue Coat's accused ASG with MAA products contain a policy index that satisfies the first and third limitations of Claim 1 of the '968 Patent.  Finjan presented substantial evidence, including Blue Coat's own documents and testimony from Blue Coat's engineers, demonstrating that policy tickets, which are the accused policy index, store allowability decisions.  PTX-522 (depicting where allowability decisions stored in the policy ticket (*see* Trial Tr. at 747:1-749:21); JTX-3036 (discussing maintaining policy decisions (*see* Trial Tr. at 749:22-751:3)); Trial Tr. at 751:4-752:16 (Nova Dep. Testimony) (Q. So these are the policy tickets that store the allowability decisions? A.  That's correct); PTX-1277 (Sorgic Dep. Testimony) (Q.  So a policy ticket can be used to keep policy decisions; correct?  A.  To keep policy decision for the duration of the transaction, yes."); Trial Tr. at 757:20-758:11 (Maxted Dep. Testimony) (Q. Would it be fair to say that the policy engine uses policy tickets to maintain policies are various checkpoints?  A.  It records the decisions made at specific checkpoints for use whenever the protocol agent needs to make that determination in its flow.).

Blue Coat's assertion that it is purportedly "undisputed" that a policy ticket only relates to a single policy is wrong and directly contradicted by the evidence Finjan presented at trial, including the plain language of Blue Coat's engineers' deposition testimony and Blue Coat's documents.  *Id.*; *see*

6

*also* PTX-331 (stating policy files contain "policies").  Indeed, on cross-examination Dr. Nielson simply disagreed with Blue Coat's engineer's testimony without relying on any documents or other testimony to support his position.  In addition, Blue Coat again mischaracterizes Dr. Mitzenmacher's testimony regarding the storage of allowability determinations  Dr. Mitzenmacher testified that policy tickets are saved and cached through the lifetime of a transaction, including multiple checkpoints where the policy is checked throughout the course of that transaction.  Trial Tr. at 835:9- 838:7.

Finally, Finjan presented substantial evidence that Blue Coat's accused GIN/WebPulse product infringes Claim 1 of the '968 Patent under the doctrine of equivalents (as described below).

### E.  Finjan Presented Substantial Evidence That Blue Coat Infringes Claim 22 of the '408 Patent.

Finjan presented substantial evidence that Blue Coat is liable for direct infringement of Claim 22 of the '408 Patent.  *See generally* Trial Tr. at 762:14-822:1; JTX-3005; PTX-526; JTX-3042; PTX-405; PTX-1025 at 34; PTX-1025 at 32; PTX-1025 at 106; PTX-1025 at 23; PTX-1025 at 108; PTX-1025 at 110; PTX-1025 at 36; PTX-214; PTX-1025 at 441; PTX-1025 at 1532; PTX-1025 at 443; PTX-1025 at 444; PTX-1025 at 1536; PTX-1025 at 1533; PTX-1025 at 1534; PTX-1025 at 443; PTX-1025 at 1775; PTX-1025 at 242; PTX-1025 at 450; PTX-1025 at 444; JTX-3050; PTX-513; PTX-1025 at 124; PTX-1025 at 305.  Blue Coat's assertions otherwise lack merit.

*First*, Finjan presented substantial evidence that Blue Coat's WSS with GIN/WebPulse satisfy Element 5 of Claim 22 of the '408 Patent, which requires "*dynamically building, while said receiving receives the incoming stream, a parse tree whose nodes represent tokens and patterns in accordance with parser rules*."  In particular, Finjan presented expert testimony and Blue Cost source code establishing that the parse tree is the context structure and describing the dynamic building of hierarchical structure of nodes pursuant to the Court's claim construction.  Trial Tr. at 801:16-810:22; PTX-1025 at 1775.  Contrary to Blue Coat's assertion, Finjan presented substantial evidence in the form of Blue Coat's source code demonstrating that Blue Coat's pContext structure is formed as soon as a document is being received, that the processing of a document begins as content is incoming and that the pContext structure contains exploit code.  Trial Tr. at 807:21-808:11; PTX-1025 at 1783; PTX-1025 at 1775; PTX-1025 at 1779.  Blue Coat again grossly mischaracterizes Dr. Mitzenmacher's trial

7

testimony wherein Dr. Mitzenmacher explicitly states that initial stages of DRTR processing have already occurred ahead of a document being received by the WebPulse component, including initialization of the structure, and repeatedly disagreed with Blue Coat's counsel incorrect suggestions regarding the process of building a process tree. Trial Tr. at 877:20-878:4 ("Q. But the document has been received by the WebPulse component; correct?  A. Oh, it says the document is no in memory at the GIN component.  Q. And that when the processing in the dynamic rating occurs; right?  A. That's when it occurs and—actually, I said that's when—the initial stages have already occurred ahead of that time, including initialization of the structure showing places like the magic bytes and so on."); *see also* Trial Tr. at 878:5-882:13.  Moreover, Blue Coat's argument plainly lacks merit because Dr. Nielson, on cross-examination, acknowledged that in some cases, DRTR only downloads a portion of the file. Trial Tr. at 1665:8-22.

*Second*, Finjan presented substantial evidence that Element 3 of Claim 22 of the '408 Patent, which requires "*instantiating a scanner for the specific programming language, in response to said determining, the scanner comprising parser rules and analyzer rules for the specific programing language, wherein the parser rules define certain patters in terms of tokens, tokens being lexical constructs for the specific programming language, and wherein the analyzer rules identify certain combinations of tokens and patterns as being indicators of corresponding exploits, exploits being portions of program code that are malicious*."  In particular, Finjan presented expert testimony, Blue Coat documents and Blue Coat source code establishing that the WSS with GIN/WebPulse instantiates scanners such as a PDF scanner, an HTML scanner, and a JavaScript scanner on the incoming programing code using parser rules including such as searching for "eval", "unescape", "OpenAction" tokens (which are lexical constructs for specific programming language) and analyzer rules such as counting the number of suspicious tokens and incrementing particular variables within the context structure (such as nShadyJScriptCalls).  Trial Tr. at 786:23-800:10; PTX-214; PTX-1025 at 441; PTX-1025 at 1532; PTX-1025 at 443; PTX-1025 at 444; PTX-1025 at 1536; PTX-1025 at 1533; PTX-1025 at 1534.  Dr. Nielson  again disagreed that the accused combination build a parse tree, but did not present a single exhibit or portion of source code to support his opinion.  Trial Tr. at 1667:4-1670:8.

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)       CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

### F.      Finjan Presented Substantial Evidence That Blue Coat Infringes, Literally and Under The Doctrine of Equivalents, Claims 1 and 10 of the '621 Patent.

Finjan presented substantial evidence that Blue Coat is liable for infringement of Claims 1 and 10 the '621 Patent, both literally and under the doctrine of equivalents.  *See generally* Trial Tr. at 892:13-924:15, 981:5-1056:4; 1087:14-1134:12; JTX-3007; PTX-423; JTX-3050; PTX-54; PTX-216; JTX-3048; PTX-199; PTX-460; PTX-293; PTX535; PTX-294; PTX-1025 at 947; PTX-1025 at 971; PTX-1025 at 1978; PTX-1025 at 1306; PTX-1025 at 1215; PTX-1025 at 2454; PTX-1025 at 2453. Blue Coat's assertions otherwise lack merit.

*First*, Finjan presented substantial evidence—including expert testimony from Dr. Medvidovic, Blue Coat documents and Blue Coat source code—that GIN/WebPulse contains hooks that interrupt the processing of requests as required by Element 3 of Claims 1 and 10 of the '621 Patent, which requires "*an interrupter for interrupting processing of the request.*"  Trial Tr. at 1010:1-1018:18; PTX-199 (demonstrating interruption of execution flow); PTX-460 (showing how kooks interrupt requests until events are marked and only then will allow process to continue its regular execution; PTX-1025 at 1978 (source code evidencing implementation of hooks to interrupt process and temporarily replace code).  Indeed, Blue Coat's own engineer, Mr. Anderson, confirmed that hooking interrupts the execution by holding it for a few seconds.  Trial Tr. at 1014:20- 1016:12.  Blue Coat's argument that monitoring and interrupting are not the same thing fails to rebut Finjan's substantial evidence of interrupting the processing of the request.

*Second*, Finjan presented substantial evidence—including expert testimony from Dr. Medvidovic, Blue Coat documents and Blue Coat source code—that GIN/WebPulse contains a comparator, namely a pattern matching engine, that is coupled to a plurality of operating system probes that compares information pertaining to the Downloadable against a predetermined security policy, i.e., patterns of events that are known to indicate potentially malicious operations.  Trial Tr. at 1018:19-1027:1; JTX-3048 (demonstrating static and dynamic analysis coupled to pattern matching engine); PTX-460 (describing pattern groups, which is a predetermined security policy, and mapping of behavioral and static events to risk scores that identify specific malicious events); PTX-293 (discussing behavioral detection patterns and comparison of Downloadable against pattern groups containing

9

predetermined security policies); PTX-535 (describing how pattern groups are coupled to probes that compare information pertaining to the Downloadable against predetermined security profiles, Trial Tr. at 1023:23-1026:21).

Finally, Finjan presented substantial evidence that Blue Coat's accused GIN/WebPulse product infringes Claims 1 and 10 of the '621 Patent under the doctrine of equivalents (as described below).

### G.   Finjan Presented Substantial Evidence That Blue Coat Infringes The '844, '494, '731, '968 and '621 Patents Under The Doctrine of Equivalents.

As set forth in Finjan's opposition to Blue Coat's motion for JMOL regarding the doctrine of equivalents, Finjan presented substantial evidence that Blue Coat infringes the following patents under the doctrine of equivalents: (i) Claim 15 of the '844 Patent (Element 2) (Trial Tr. at 469:16-496:21, 537:14-539:9; JTX-3007; PTX-423; JTX-3050; PTX-54; PTX-216; PTX-199; PTX-460; PTX-1025); (ii) Claim 10 of the '494 Patent (Element 10) (Trial Tr. at 469:16-496:21, 540:18-542:13, 552:18-554:10, 559:11-560:8; PTX-211; PTX-516; JTX-3060; PTX-1274; PTX-368; PTX-564; PTX-499; PTX-1025; PTX-427; JTX-3050; PTX-423; JTX-3043; PTX-49; PTX-216; JTX-3001);(iii) Claim 1 of the '731 Patent (Element 1) (Trial Tr. at 618:8-24, 624:21-24, 625:19-640:19, 735:14-738:6; PTX-360, PTX-289; PTX-575; PTX-426; PTX-1025; JTX-3003; JTX-3048; JTX-3120); (iv) Claim 1 of the '968 Patent (Elements 1 and 3) (Trial Tr. at 618:25-619:15, 624:25-625-2, 625:19-640:19, 760:19-762:13; JTX-3037; JTX-3036; JTX-3037; PTX-331; PTX-522); and (v) Claims 1 and 10 of the '621 Patent (Element 3) (Trial Tr. at 902:16-924:22, 981:9-987:9, 1050:14-1051:23; JTX-3007; PTX-423; JTX-3050; PTX-54; PTX-216; PTX-199; PTX-460; PTX-1025).

Finjan's experts, Drs. Cole, Mitzenmacher and Medvidovic, testified at length about the background of the invention and the function of the Accused Products, before ever beginning their element-by-element analysis of literal infringement, and later, infringement under the doctrine of equivalents.  Contrary to Blue Coat's assertion, Finjan presented substantial evidence of infringement under the doctrine of equivalents and did not merely rely on the same literal infringement conclusions. Moreover, the only evidence Blue Coat presented to rebut Finjan's substantial evidence is statements from Dr. Nielson, without citing any exhibits or witness testimony, that what Finjan accused is not equivalent.  Trial Tr. at 1601:15-1602:20, 1626:12-1630:5, 1640:2-11, 1653:6-22, 1683:22-1684:23.

10

Thus, Blue Coat is not entitled to JMOL of no infringement under the doctrine of equivalents for each of these Asserted Patents.

## III.   FINJAN PRESENTED SUBSTANTIAL EVIDENCE OF BLUE COAT'S WILLFUL INFRINGEMENT

Finjan presented substantial evidence that Blue Coat knowingly, intentionally and egregiously infringes Finjan's Asserted Claims and no reasonable jury could find that Blue Coat's infringement was not willful.  Fed. R. Civ. P. 50(a)(1).  Blue Coat's arguments regarding knowledge of the Asserted Patents are spurious.  Blue Coat does not dispute that it had pre-suit knowledge of the '844, '731 and '968 Patents, stipulated in the Final Pretrial Order that it had pre-suit knowledge of the '494 and '408 Patents since at least May 1, 2014 when the parties filed a Second Joint Case Management Statement in *Blue Coat I*, and further stipulated in the Final Pretrial Order that it was knowledge of the '621 Patent since the filing of Finjan's First Amended Complaint in this action on March 1, 2016.  Dkt. No. 359 at 8.  Finjan presented substantial evidence that despite this knowledge, Blue Coat elected to take affirmative steps to infringe Finjan's Patents, such as implementing into new products technology that Blue Coat knew infringed Finjan's patents based on the *Blue Coat I* action and verdict.  Blue Coat's Senior Vice President of Product Management testified that Blue Coat did nothing to change its products following the jury's verdict of infringement in *Blue Coat I.*  Trial Tr. at 1404:17-1405:4, 1406:15-22, 1406:19-1407:5, 1409:24-1410:16.  Finjan introduced evidence, including Blue Coat documents, confirming the launch date of the Accused Products as after the *Blue Coat I* verdict and that Blue Coat incorporated this infringing technology into new products.  Trial Tr. at 1406:16-1410:16, 1411:4-1414:12; PTX-55; PTX-48; PTX-49.  Finjan also produced evidence, including Blue Coat's internal e-mails, demonstrating that Blue Coat obtained in 2011 Finjan's patented technology in secret and, after analysis, identified the features in Finjan's technology that Blue Coat should incorporate into its products.  Trial Tr. at 1414:15-1420:23; PTX-929; PTX-113.  Finjan also presented unrebutted expert testimony from Dr. Cole that no reasonable company would have increased its infringement, as Blue Coat did, while a patent case is pending against it.  Trial Tr. at 562:12-16.  Rather, a company would get a license, reduce the infringing technology or create next generation

products that do not infringe.  Trial Tr. at 562:12-18.  Dr. Cole provided further unrebutted testimony that a reasonable company would not continue developing and releasing products containing infringing technologies after a verdict of infringement against the company.  Trial Tr. at 562:24-564:5.  Blue Coat's assertion that it thought the *Blue Coat I* verdict either gave it a right to use all the accused products is directly contradicted by the trial testimony of Mr. Schoenfeld, who confirmed that Blue Coat knew it did not receive a portfolio license to all of Finjan's patents and the *Blue Coat I* verdict was limited to the specific products at issue in that case which are different from the products accused here.  Trial Tr. at 1406:12-1407:5.  Blue Coat provided no evidence, from fact or expert witnesses, regarding whether the infringing technology in *Blue Coat I* is the same as the infringing technology in this litigation.  Nor did Blue Coat's damages expert provide any opinions of what portion of damages, if any, overlap with damages from the previous litigation.  Willfulness can be established by circumstantial evidence particular where, as here, the infringing party had knowledge of the asserted patents.  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 860 (Fed. Cir. 2010), *aff'd* 564 U.S. 91 (2011); *Stryker Corp. v. Zimmer, Inc.*, 837 F.3d 1268, 1278-79 (Fed. Cir. 2016).  Based on the evidence Finjan presented and the lack of evidence provided by Blue Coat, a reasonable jury could only conclude that Blue Coat willfully infringes Finjan's Asserted Patents.

## IV.  FINJAN PRESENTED SUBSTANTIAL EVIDENCE SUPPORTING DAMAGES FOR BLUE COAT'S INFRINGEMENT OF THE ASSERTED CLAIMS

### A.  Finjan Presented Substantial Evidence to Support Damages Based on Worldwide Users of GIN.

Finjan presented substantial evidence to support damages based on worldwide users of GIN/WebPulse.  Contrary to Blue Coat's assertion, Finjan presented substantial evidence establishing that the GIN/WebPulse product used abroad is made in the United States.[2]  Software is made when the source code is compiled into a program.  *CNET Networks, Inc. v. Etilize, Inc.*, 528 F. Supp. 2d 985, 994 (N.D. Cal. 2007).  The trial evidence Finjan presented confirms that all of GIN/WebPulse's source code is maintained in the U.S., it is compiled in the U.S., and all updates of GIN/WebPulse are made in

---

[2] Finjan incorporates its Response to Blue Coat's November 2, 2017 Objections Regarding Infringement Under § 271(a) by its Manufacture and Use of GIN.  Dkt. No. 405.

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)          CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

the U.S. and are pushed out to all of its data centers. Accordingly, every version of GIN/WebPulse running on any of Blue Coat's worldwide data centers are made in the U.S.

*Microsoft Corp. v. AT&T Corp.*, 127 S.Ct. 1746 (2007), is not relevant to § 271(a) here because this is not a case where the parties agree that infringement only occurs when software is installed abroad. To the contrary, in this case GIN/WebPulse is undisputedly made (compiled) in the U.S and GIN/WebPulse itself infringes without the need for any additional components to be installed outside of the U.S. Under § 271(a), "[w]hen [the accused infringer] made the [accused products] in this country, it infringed [the claim at issue] … [and] [w]hether those [accused products] were sold in the U.S. or elsewhere is therefore irrelevant . . . ." *See Card-Monroe Corp. v. Tuftco Corp.*, No. 1:14-cv-292, 2017 WL 3841878, at *43–45 (E.D. Tenn. Sept. 1, 2017) (quoting *Railroad Dynamics, Inc. v. A. Stuki Co.*, 727 F.2d 1506, 1519 (Fed. Cir. 1984) (holding that a royalty award could reach units made in the U.S.—valued at their sale price—regardless of whether they were sold abroad)); *see also Goulds' Mfg. Co. v. Cowing*, 105 U.S. 253, 256 (1881) (approving an award based on defendant's profits, reaching units made in the U.S. where some were to be used only abroad).

Blue Coat concedes that Finjan presented evidence that GIN/WebPulse is developed in the United States. Dkt. No. 424 at 11-12. Finjan also presented expert testimony from Dr. Medvidovic, relying upon Blue Coat documents and witness testimony, that Blue Coat makes and compiles in the United States GIN/WebPulse, including all of its subcomponents, as well as that all MAA code is made in and pushed out of the United States. Trial Tr. at 982:22-987:2; PTX-216. Dr. Mitzenmacher testified to the same. Trial Tr. at 765:10-12. Dr. Medvidovic also offered testimony and evidence that GIN/WebPulse used overseas is controlled by Blue Coat from the United States, and that Blue Coat's U.S. and worldwide users receive the beneficial use of GIN/WebPulse. Trial Tr. at 1051:24-1055:20; PTX-52. Finjan offered further evidence through Dr. Cole, Blue Coat documents and Blue Coat witness testimony that all development, maintenance, enhancement, and work on GIN/WebPulse is done in Draper, Utah. Trial Tr. at 495:7-496:21, 536:6-10; PTX-216. Dr. Mitzenmacher also testified that the GIN/WebPulse product is developed in Draper, Utah, all GIN/WebPulse updates are pushed out of that location, and if the GIN/Webpulse service in Draper, Utah is shut down, GIN/WebPulse in

its entirety would cease to function.  Trial Tr. at 765:3-22.  Finjan also presented Blue Coat's responses to Finjan's requests for admission that GIN/WebPulse, including DRTR, is developed in the United States, and that updates for WebPulse, including DRTR, are pushed out of the United States.  Trial Tr. at 889:9-23.  Finjan also presented substantial evidence that FRS is in GIN/WebPulse ,which is developed in the United States, and the results of the Malware Analysis Appliances are fed into FRS in the United States and for the benefit and use within the United States.  Trial Tr. at 513:6-514:3, 529:9-532:18, 534:8-536:16, 916:15-918:2, 919:7-922:14, 981:23-982:16, 1042:3-18, 1043:11-19, 1051:24-1055:20, 1120:11-1120:21; JTX-3050; PTX-54.

Blue Coat misstates governing law.  As set forth in the Court's final jury instructions, the jury "may award damages [] if [it] finds that Finjan has proved that each of the claim elements of an Asserted Claim is made and combined in the United States."  Dkt. No. 428 at 40 (Instruction No. 30-1).  As set forth above, Finjan presented substantial evidence that GIN/WebPulse is made and combined in the United States.  As such, Blue Coat is not entitled to JMOL regarding worldwide users of GIN/WebPulse.  Moreover, *Microsoft* is not applicable to a case where the benefit and control of a system claim is in the U.S.  Instead, in *Microsoft* the Court concluded that exporting a component that would later be assembled into an infringing system did not amount to infringement under 35 U.S.C. § 271(f).  *Microsoft*, 127 S.Ct. at 1755-60.  As such, *Microsoft* is inapplicable, because the complete infringing product, GIN/WebPulse, and components like WebPulse, FRS, DRTR, and MAA, are all made and used in the U.S.  Notably, this Court in *CNET Networks, Inc. v. Etilize, Inc.* considered *Microsoft* and concluded that an infringing product was made in the U.S. when it was "expressed and stored as machine-readable object code, e.g. burned on a CD– ROM or written to a server hard drive such that it is capable of being downloaded from the internet…[and the] software become an actual, physical component amenable to combination."  528 F. Supp. 2d 985, 994 (N.D. Cal. 2007) (citing *Microsoft*, 127 S.Ct. at 1756).  *CNET* mirrors this case because Finjan provided evidence that GIN and it subcomponents were developed, compiled and stored on a computer readable medium in the U.S. as a complete infringing system.  *See NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1316-17 (Fed. Cir. 2005).

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)          CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

### B.      Blue Coat Failed to Present Substantial Evidence of Government Sales.

Blue Coat failed to present "a legally sufficient evidentiary basis" at trial to support an affirmative defense under 28 U.S.C. § 1498 ("Section 1498"). Fed. R. Civ. P. 50(a). The Section 1498 affirmative defense requires proof of two elements: (1) that the use or manufacture of the infringing product was for the Government and (2) that the use of the infringing product was with the authorization or consent of the Government that is express or implied. *Sevenson Envtl. Servs., Inc. v. Shaw Envtl., Inc.*, 477 F.3d 1361, 1365-67 (Fed. Cir. 2007). Government sales, standing alone, do not establish a defense under Section 1498. *Erie Eng'd Prods., Inc. v. Wayne Integrated Techs., Corp.*, No. CV 03-3776, 2005 WL 6582921, at *3 (E.D.N.Y. July 29, 2005). Blue Coat failed to present evidence to prove that the Government provided express or implied consent to use the infringing the Accused Products.

First, Blue Coat failed to present substantial evidence of express consent which is typically established by an explicit authorization or consent clause within a contract. *Parker Beach Restoration, Inc. v. U.S.*, 58 Fed. Cl. 126, 132 (2003). Blue Coat offered no contracts or agreements with the U.S. Government and its fact witnesses discussed products not at issue in this case (Trial Tr. at 1402:18-21), referred to generalized meetings with and training provided to U.S. Government customers with no indication that such trainings and meetings relates specifically to the Accused Products (Trial Tr. at 1403:2-13), and testified that they did not know which products on the only two exhibits Blue Coat presented JTX-3070 and DTX-2095 were relevant to this case. Trial Tr. at 1574:7-25, 1576:13-18. Second, Blue Coat also failed to provide evidence of any **implied** authorization or consent by the Government. Blue Coat failed to present any evidence at trial that the U.S. Government had any knowledge of infringement or that the U.S. Government customers received and used any of the infringing products that were first sold to the distributors—which is required to show implied consent. *Larson v. U.S.*, 26 Cl. Ct. 365, 370 (1992). Blue Coat's witness testified that "a way" to verify that the end-user is using the products is when the technical support team is contacted by an end-user, but did not testify that this actually occurred with respect to any U.S. Government customers. Trial Tr. at 1575:4-14. Thus, Blue Coat is not entitled to JMOL regarding government sales.

15

### C.   Finjan Presented Substantial Evidence to Support an Award of Reasonable Royalties.

Finjan presented substantial evidence at trial that it is entitled to damages in the amount of no less than a reasonable royalty pursuant to 35 U.S.C. § 284 for Blue Coat's infringement of the Asserted Patents. Finjan's CEO, Philip Hartstein, testified regarding Finjan's licensing practices (Trial Tr. at 357:13-392:15); Finjan's general approach to licensing (Trial Tr. at 357:13-358:17); Finjan's licensing rates of 8-16% of revenues, $8 per user (Trial Tr. at 358:17-368:9, 446:24-447:2); provisions in Finjan's licenses (Trial Tr. at 368:10-371:14); and Finjan's prior licenses, settlements and verdicts (Trial Tr. at 371:19- 392:15).

At trial, Finjan presented the expert testimony of Drs. Cole, Mitzenmacher, and Medvidovic regarding the extent of Blue Coat's infringement. Drs. Cole and Dr. Medvidovic testified that Webpulse processes more than 1.2 billion requests per day, and 80 million of those requests are processed by DRTR and Yara rules in the context of DRTR. Trial Tr. at 471:3-17, 482:6-23, 502:14-504:14, 916:15-23, 1059:9-1060:16; PTX-105; JTX-3050. Finjan also played the deposition testimony of Tyler Anderson, architect of GIN, who testified that Webpulse processes 1.2 billion worldwide requests. PTX-1281 at 70:14-19, 71:12-25.

Dr. Medvidovic testified regarding the technical advantages of each of the Asserted Patents. Trial Tr. at 899:17-21, 1056:24-1070:17. He testified that Finjan's patented technology provide advantages in dealing with unknown threats, generating security profiles, recording and reusing security profiles, and assessing potentially malicious Downloadables at runtime. Trial Tr. at 1061:25-1067:14. In particular, Dr. Medvidovic testified that the technical advantages of the Asserted Patents include, among other advantages: (i) '844 Patent: providing zero-day protection, increasing efficiency, permits offloading to the cloud and decreases expenses (Trial Tr. at 1062:15-1064:4); (ii) '494 Patent: increase speed and efficiency by storing the Downloadable security profile, proactive blocking of threats and reduction of costs (Trial Tr. at 1064:5-20); (iii) '621 Patent: real-time detection of previously unknown Downloadables, simultaneous monitoring of multiple subsystems, reduction of false positives and efficiency (Trial Tr. at 1064:21-1605:17); (iv) '731 Patent: efficient caching, use of fewer resources, rapid subsequent analysis of content, efficient and secure dissemination of web

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)          CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

content (Trial Tr. at 1066:9-24); (v) '968 Patent: rapid dissemination of security decisions, optimized subsequent analysis, efficient use of system resources, flexibility to end user (Trial Tr. at 1066:25-1067:19); and (vi) '408 Patent: providing a language independent solution for building parse trees and allowing detection of combined attacks (Trial Tr. at 1067:20-1068:9). Dr. Medvidovic presented testimony that Blue Coat uses and benefits from this multi-faceted defense. Trial Tr. at 1069:7-1070:17.

Dr. Medvidovic also presented evidence and testimony at trial, including Blue Coat documents and witness testimony and the opinions of Finjan's technical experts, regarding the architecture of the Accused Products and how they relate to the technologies of each of Finjan's Asserted Patents (Trial Tr. at 899:21-24, 1070:17-1072:25; JTX-3043) as follows: (i) ASG: three of the six capabilities Blue Coat identified are covered by the '968 and '731 Patents (Trial Tr. at 1075:25-1076:24; PTX-55); (ii) MAA: ten of the fourteen capabilities Blue Coat identified are covered by the '968 and '731 Patents (Trial Tr. at 1076:25-1080:11; JTX-3080); (iii) GIN/WebPulse: five of the forty-six capabilities Blue Coat identified are covered by the '621 Patent eleven of the forty-six capabilities Blue Coat identified are covered by the '844 Patent (Trial Tr. 1080:12-1084:8; PTX-216), and one of these capabilities is FRS (Trial Tr. at 1083:4-7; PTX-216); and (iv) WSS: three of the twenty-seven capabilities Blue Coat identified are covered by the '408 Patent (Trial Tr. at 1084:9-1086:7; PTX-526). Contrary to Blue Coat's assertion, that Dr. Medvidovic assigned equal weight to each of these architectural components is not arbitrary, but rather based on principle in software engineering called abstraction and modularity that when you describe a system in its major building blocks, each system component is of equal weight. Trial Tr. at 1075:5-24 (ASG), 1079:13-1080:11 (MAA), 1082:23-1084:8 (GIN/WebPulse), 1085:25-1086:7 (WSS). Dr. Medvidovic further testified that he reviewed and analyzed each of Blue Coat's license agreements and concluded that none were technologically comparable to the Asserted Patents. Trial Tr. at 900:20-902:5.

Dr. Medvidovic also confirmed the absence of any evidence relating to a non-infringing alternative to Finjan's Asserted Patents. Trial Tr. at 1055:24-1056:4.

Finjan's damages expert, Dr. Meyer, presented an opinion, based on Blue Coat's documents

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)         CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

and witnesses, Finjan's documents and witnesses industry publications and testimony of Finjan's technical experts, regarding the appropriate reasonable royalty for Blue Coat's infringement of the Asserted Patents.  Trial Tr. at 1189:14-1227:21, 1234:20-1242:1; PTX-727; PTX-743; PTX-744; PTX-245; JTX-3080; PTX-55; PTX-526; JTX-3050; PTX-1283.  Dr. Meyer testified that the hypothetical negotiation dates for each of the Accused Products are (as agreed to by the parties): '408 Patent-August 28, 2013; '494 Patent- March 18, 2014; '844, '731 and '968 Patents- July 15, 2017; and '621 Patent- March 1, 2016.  Trial Tr. at 1187:19-1188:10; Dkt. Nos. 384, 393.

Dr. Meyer testified that she utilized a revenue-based methodology for the '731, '968 and '408 Patents, and explained how she identified the appropriate revenue for each Accused Product based on Blue Coat revenue information, including only the specific sales related to the Accused Products and, where a combination of products accused, only including sales where a customer purchased the specific combination.  Trial Tr. at 1240:2-1247:23.  In testifying regarding how she apportioned the revenues associated with a particular Accused Product, Dr. Meyer explained she relied on Dr. Medvidovic's analysis regarding the architectural components of the Accused Products for the '731, '968, and '408, Patents,  and performed her own economic analysis.  Trial Tr. at 1247:24-1250:6.  Contrary to Blue Coat's assertion, Dr. Meyer did not double-count damages.  Dr. Meyer testified that she specifically only accounted for a feature one time in her damages calculation.  *See, e.g.*, Trial Tr. at 1274:16-1276:4.  Dr. Meyer further explained that Blue Coat's suggestion of double-counting failed because Blue Coat referred to tables that included patents that were no longer accused against GIN/WebPulse.  Trial Tr. at 1294:20-1296:4.

Dr. Meyer testified she relied on Mr. Hartstein's testimony regarding the appropriate royalty rate to apply, which is 8% on hardware and 16% on software, *inter alia,* based on Finjan's licensing practices.  Trial Tr. at 1226:10-1227:21.  Contrary to Blue Coat's assertion, Dr. Meyer's use of a 16% royalty rate for software is not based on the "rule of thumb," but is rather based on Finjan's longstanding licensing practices (Trial Tr. at 1222:2-6); and also the jury verdict in *Sophos*, wherein the jury was presented with a 16% royalty rate on software and awarded damages in line with that rate (Trial Tr. at 1236:2-10).  Blue Coat mischaracterizes the testimony Finjan's President, Mr. Hartstein,

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)          CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

wherein he explained that the 8% royalty rate for hardware and 16% royalty rate for software first came about based on the jury's verdict in the *Secure Computing* case awarding these rates.  Trial Tr. at 358:17-359:2.  Mr. Hartstein testified that since that time, Finjan consistently used those rates in its licensing negotiations.  *Id.*  Dr. Meyer confirmed that she did not rely on the jury verdict in the *Secure Computing* case, although she acknowledged that the 8 and 16% royalty rates from the *Secure Computing* case were affirmed by the Federal Circuit and Finjan was paid $37.3 million based on the verdict in that matter.  Trial Tr. at 1351:4-18.  Rather, she relied on Finjan's established practices as discussed above.  Trial Tr. at 1290:24-1291:16.

Dr. Meyer also testified that she discounted the royalty base to the date of the hypothetical negotiation to account for the present value of money and risk associated with future revenue projections.  Trial Tr. at 1253:7-1254:7.  Dr. Meyer opined that a reasonable royalty for infringement of the '731, '968, and '408 Patents based on revenues was: $337,444 for the' 731 Patent, $544,960 for the infringement of the '968 Patent alone or with the '731 Patent, and $373,406 for the '408 Patent.  Trial Tr. at 1254:8-1255:25.

Dr. Meyer also testified regarding the user-based methodology for determining a reasonable royalty for infringement by the FRS component of GIN/ Webpulse using the asserted claimed inventions of the '844 and '621 Patents, including her reliance on all of the testimony, including Mr. Hartstein's testimony regarding applying a royalty rate of $8 per user, the importance and value of GIN/WebPulse, and Dr. Medvidovic's testimony regarding the architectural components of GIN/WebPulse including the fact that FRS is 1 out of 46 features of GIN along with all the trial testimony that there are 175 million users of GIN.  Trial Tr. at 768:14-769:11, 831:4-832:2, 886:24-887:1, 1081:2-1084:8, 1215:17-1217:11, 1256:1-1259:8, 1355:20-1357:11; PTX-526.  Contrary to Blue Coat's assertion, Finjan presented substantial evidence that the 175 million user figure relates to Blue Coat users all of which have access to GIN/WebPulse.  Trial Tr. at 1410:18023.  In addition, Finjan presented substantial evidence demonstrating how FRS is accused of infringement.  *See, e.g.* Trial Tr. at 471:6-13, 482:24-483:2, 483:21-23, 486:19-487:23, 496:25-497:3, 497:13-498:18, 500:22-5-501:9, 513:6-514:3, 528:9-529:8, 530:7-17, 531:15-532:3 (Runald Testimony), 533:13-537:4, 538:8-

19

1   539:9, 907:21-911:10, 912:11-913:7, 915:17-916:14, 917:7-918:2, 919:14-920:24, 923:22-924:15,

2   981:23-982:16, 990:23-991:16, 993:19-995:6, 1000:14-1001:11, 1042:22-1043:19, 10554:25-1055:20;

3   JTX-3001; JTX-3043; JTX-3048; JTX-3050; PTX-423.

4       Dr. Meyer also testified regarding the appropriate reasonable royalty for Blue Coat's

5   infringement of the '494 Patent by GIN/Webpulse under a user-based methodology apportioning

6   $8/user by 2.7% of the traffic considering the traffic from the previous case and appropriate time

7   period, including when the infringing components were added to the Accused Products, that goes to

8   the footprint of the invention (DRTR/YARA) along with the trial testimony regarding the fact that

9   there are 75 million users of Webpulse.  Trial Tr. at 1058:18-1060:16, 1259:8-1262:25; JTX-3050.

10  Finjan presented substantial evidence supporting its assertions regarding the increase in traffic

11  including, for example, the testimony of Dr. Eric Cole that other systems rely on YARA rules stored in

12  the SeeMore database and that lead to an increased detection of malicious code, and that this increase

13  is the reason Blue Coat added the YARA rules.  Trial Tr. at 553:22-554:10.

14       Dr. Meyer also testified that the percentage of U.S. users is about 52 percent based upon

15  information Blue Coat provided in which 52% of revenues across Blue Coat products are U.S.

16  revenues.  Trial Tr. at 1217:12-1218:7, 1263:21-1264:11; PTX-1283.  Based on a user-based method

17  of calculating damages, she opined that a reasonable royalty for infringement of the '494 Patent based

18  on DRTR/Yara was $16.2 million, and a reasonable royalty for infringement of the '844 and/or '621

19  Patents based on FRS was $29.8 million.  Trial Tr. at 1263:15-18.

20       Finjan presented substantial evidence supporting a reasonable royalty premised on $8 per user.

21  Finjan's President, Mr. Hartstein, testified that Finjan's licensing practices include an $8 per user rate,

22  which is based on converting its 8-16% revenue based royalty rate to the paradigm of a subscription

23  model.  Trial Tr. at 364:13-21, 365:16-366:6.  Mr. Hartstein testified that Finjan verified its $8 per user

24  rate by looking at pricing structures, has experienced the $8 per user rate in its business, and uses the

25  $8 per rate in negotiations when Finjan doesn't have access to the amount of money to apply its rates

26  to or in a scenario where use of the technology has a greater value than that of just the revenues.  Trial

27  Tr. at 365:17-368:9.  Dr. Meyer explained that Finjan's $8 per user rate appeared to be the basis of the

28

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)        CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

jury's damages award against another company called WebPulse. Trial Tr. at 1235:20-23. Dr. Meyer also specifically highlighted the baseless nature of Blue Coat's argument regarding the damages period for the '621 Patent as less than two-and-a-half years, calling it and "apples to oranges" comparison and explaining the purpose of the number is to convert a revenue based royalty rate to a per user approach. Trial Tr. at 1318:4-1319:18. Thus, Contrary to Blue Coat's assertion, the $8 per user fee is tied to the facts of this case and the patents asserted here.

Blue Coat's damages expert, Mr. Thomas, failed to rebut Finjan's substantial evidence that it is entitled to a reasonable royalty. Mr. Thomas opined that the appropriate royalty rate to apply to revenues was 4-6% based on Finjan's patent license agreements with M86 that was executed years before the relevant hypothetical negotiation dates and Trustwave. However, Mr. Thomas admitted on cross-examination that the 4% royalty rate was applied to total revenues related to an OEM that was the "floor" and on top of what was already paid as part of the license fee in the initial agreement. Trial Tr. at 1892:13-1893:17, 1911:1-1912:13. He also admitted that there were rates of at least 8% in Finjan's patent license agreements dated around the times of the hypothetical negotiations. Trial Tr. at 1894:11-1897:2. He also agreed that the $8 per user was used in the *Blue Coat I* case and the royalty based on the $8 per user was upheld by the Court. Trial Tr. at 1892:6-12. Mr. Thomas also improperly failed to assess damages for each patent, and assumed that the '844 and '494 Patents covered the identical technology and treated them like they were one patent, despite the fact that he could not identify a single instance in which Finjan grouped two patents together and charged the same license amount for them. Trial Tr. at 1878:9-1879:3. He also mistakenly referred to Dr. Meyer's user-based method as an improper "reasonableness check" when the "reasonableness check" had been employed against Dr. Meyer's previous damages calculation of $23 million when additional products were accused of infringement in the case. Trial Tr. at 1890:13-1891:7.

Mr. Thomas did not have any opinion regarding a reasonable royalty for Blue Coat's infringement of the '844 and '621 Patents in which FRS was at issue. He acknowledged during trial that he was not aware that FRS was infringing or alleged to be infringing at the time of his report. Trial Tr. at 1880:3-18. Mr. Thomas also acknowledged that there were no revenues for

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)          CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

GIN/Webpulse, that he used a proxy for what he called "GIN/Webpulse revenues" and Blue Coat calls GIN the center of the universe for all its products.  Trial Tr. at 1884:1-1886:25.  He also acknowledged that no Blue Coat witness testified that revenues for Webfilter and Intelligence Services represented the value of GIN.  Trial Tr. at 1887:1-13.

Mr. Thomas also admitted during trial that he did not confirm whether the government actually used the accused products or knew that the products were accused of infringement before removing government sales from his royalty base.  Trial Tr. at 1887:17-1888:2.

Mr. Thomas' apportionment of the ASG product based on 1% traffic sent from the CAS to the MAA was not tied to the entire infringing technology because it did not address any of the infringement involving the ASG product at issue.  Trial Tr. at 1888:3-1889:15.  Mr. Thomas used an even higher apportionment of GIN/Webpulse based on 6.7% Webpulse traffic sent to DRTR, rather than the 2.7% Webpulse traffic that Finjan's damages expert used.  Trial Tr. at 1889:16-1890:12.  Blue Coat failed to present contrary evidence to rebut Finjan's evidence supporting damages, and, as a result, no reasonable jury could conclude that Finjan is not entitled to a reasonable royalty.

Finally, Blue Coat's assertion that it presented evidence comparing the accused products here to those at issue in *Blue Coat I* is entirely meritless.  Blue Coat never provided any expert opinion regarding whether the infringing technology from Blue Coat I is the same as the infringing technology in this litigation.   Nor did Blue Coat's damages expert provide any opinions of what portion of damages, if any, overlapped with damages from the previous litigation.  In fact, as described above, Blue Coat's assertion is directly contradicted by the trial testimony of Mr. Schoenfeld, who confirmed that Blue Coat knew it did not receive a portfolio license to all of Finjan's patents and the *Blue Coat I* verdict was limited to the specific products at issue in that case which are different from the products accused here.  Trial Tr. at 1406:12-1407:5. Thus, Blue Coat is not entitled to JMOL of no damages.

## V.    CONCLUSION

For the foregoing reasons, Finjan requests that the Court deny Blue Coat's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure Rule 50(a).

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)       CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW

1

Respectfully submitted,

2
Dated:  November 28, 2017

By: */s/ Lisa Kobialka*

3
Paul J. Andre (SBN 196585)
Lisa Kobialka (SBN 191404)

4
James Hannah (SBN 237978)
Hannah Lee (SBN 253197)

5
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP

6
990 Marsh Road

7
Menlo Park, CA  94025
Telephone:  (650) 752-1700

8
Facsimile:   (650) 752-1800
pandre@kramerlevin.com

9
lkobialka@kramerlevin.com
jhannah@kramerlevin.com

10
hlee@kramerlevin.com

11
*Attorneys for Plaintiff*

12
FINJAN, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FINJAN'S OPPOSITION TO BLUE COAT'S RULE 50(A)          CASE NO. 15-cv-03295-BLF-SVK
MOTION FOR JUDGMENT AS A MATTER OF LAW