STEFANI E. SHANBERG (State Bar No. 206717)
sshanberg@mofo.com
NATHAN B. SABRI (State Bar No. 252216)
nsabri@mofo.com
ROBIN L. BREWER (State Bar No. 253686)
rbrewer@mofo.com
EUGENE MARDER (State Bar No. 275762)
emarder@mofo.com
MADELEINE E. GREENE (State Bar No. 263120)
mgreene@mofo.com
MICHAEL J. GUO (State Bar No. 284917)
mguo@mofo.com
ALEX N. HADDUCK (State Bar No. 312962)
ahadduck@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
Telephone:     (415) 268-7000
Facsimile:     (415) 268-7522

DAVID A. NELSON (*Pro Hac Vice*)
davenelson@quinnemanuel.com
NATHAN A. HAMSTRA (*Pro Hac Vice*)
nathanhamstra@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
500 W. Madison Street, Suite 2450
Chicago, Illinois 60661
Telephone:     (312) 705-7400
Facsimile:     (312) 707-7401

Attorneys for Defendant
BLUE COAT SYSTEMS LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation,<br><br>                Plaintiff,<br><br>        v.<br><br>BLUE COAT SYSTEMS LLC, a Delaware Corporation,<br><br>                Defendant. | Case No.:   15-cv-03295-BLF-SVK<br><br>**BLUE COAT SYSTEMS LLC'S NOTICE OF MOTION AND PARTIAL RENEWED RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................. 1

II. LEGAL STANDARD ........................................................................................... 1

III. NO LITERAL INFRINGEMENT OF THE '844 PATENT ................................. 2

    A. Finjan Failed to Provide Evidence That the Accused Products Identify Suspicious Code. .................................................................................... 2

    B. Finjan Failed to Provide Evidence That the Accused Products Link a Downloadable Security Profile to a Downloadable Before a Web Server Makes the Content Available to Web Clients. ........................................... 4

IV. NO LITERAL INFRINGEMENT OF THE '494 PATENT ................................. 6

V. NO INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS ......... 8

VI. NO WILLFUL INFRINGEMENT OF THE '844 AND '494 PATENTS ......... 10

VII. NO WORLDWIDE DAMAGES ON THE '844 AND '494 PATENTS ........... 12

VIII. CONCLUSION ................................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Centillion Data Sys. LLC v. Quest Commc'ns Int'l*,
   631 F.3d 1279 (Fed. Cir. 2011)................................................................................13

*Consolidated Edison Co. v. NLRB*,
   305 U.S. 197 (1938).........................................................................................2

*Eolas Techs. Inc. v. Microsoft Corp.*,
   No. 99 C 626, 2003 U.S. Dist. LEXIS 13482 (N.D. Ill. Aug. 1, 2003) ....................13

*Finjan, Inc. v. Cisco Sys.*,
   Case No. 17-cv-00072-BLF, 2017 U.S. Dist. LEXIS 87657 (N.D. Cal. June 7,
   2017) ....................................................................................................11

*Fr. Telecom S.A. v. Marvell Semiconductor Inc.*,
   39 F. Supp. 3d 1080 (N.D. Cal. 2014) ...................................................................13

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   136 S. Ct. 1923 (2016).............................................................................10, 11

*Headwaters Forest Defense v. County of Humboldt*,
   240 F.3d 1185 (9th Cir. 2000), *vacated on other grounds*, 534 U.S. 801 (2001).......................1

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
   347 F. Supp. 2d 114 (D. Del. 2004) ..........................................................................8

*Johnson v. Paradise Valley Unified Sch. Dist.*,
   251 F.3d 1222 (9th Cir. 2001)..................................................................................2

*Kalitta Air, LLC v. Cent. Tex. Airborne Sys.*,
   No. C 96-2494 CW, 2005 U.S. Dist. LEXIS 43317 (N.D. Cal. Jul. 22, 2005)..........................1

*Lear Siegler, Inc. v. Sealy Mattress Co.*,
   873 F.2d 1422 (Fed. Cir. 1989)..................................................................................9

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007).........................................................................................13, 14

*Monolithic Power Sys., Inc. v. Silergy Corp.*,
   127 F. Supp. 3d 1071 (N.D. Cal. 2015) ...................................................................11

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010).........................................................................................14

*NTP, Inc. v. Research in Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005)..................................................................................13

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
 711 F.3d 1348 (Fed. Cir. 2013)........................................................................14

*Radware, Ltd. v. F5 Networks, Inc.*,
 Case No. 5:13-cv-02024-RMW, 2016 U.S. Dist. LEXIS 112504 (N.D. Cal.
 Aug. 22, 2016) .............................................................................................11

*Research Corp. Techs., Inc. v. Microsoft Corp.*,
 No. CV-01-658-TUC-RCJ, 2009 U.S. Dist. LEXIS 135255 (D. Ariz. 2009) .........................14

*Streck, Inc. v. Research & Diagnostic Sys.*,
 665 F.3d 1269 (Fed. Cir. 2012)........................................................................12

*Texas Instruments, Inc. v. Cypress Semiconductor Corp.*,
 90 F.3d 1558 (Fed. Cir. 1996)......................................................................9, 10

*TI Group Auto. Sys. (N.A.) v. VDO N.A., LLC*,
 C.A. No. 00-432-GMS, 2002 U.S. Dist. LEXIS 17783 (D. Del. Sep. 4, 2002),
 *aff'd* 375 F.3d 1126 (Fed. Cir. 2004) ..................................................................1

*Vectren Commc'n Servs. v. City of Alameda*,
 No. C 08-3137 SI, 2011 U.S. Dist. LEXIS 35523 (N.D. Cal. Mar. 22, 2011)..........................2

*Volterra Semiconductor Corp. v. Primarion, Inc.*,
 799 F. Supp. 2d 1092 (N.D. Cal. 2011) ................................................................2

*Zoltar Satellite Alarm v. Snaptrack, Inc.*,
 No. C 01-20291 JW, 2004 U.S. Dist. LEXIS 27713 (N.D. Cal. July 26, 2004)....................1, 2

**Statutes**

35 U.S.C. § 101 ...........................................................................................15

35 U.S.C. § 271(a) .........................................................................................13

**Rules**

Fed. R. Civ. P. 50(a).......................................................................................9

Fed. R. Civ. P. 50(b) .......................................................................................1

1

## **TABLE OF ABBREVIATIONS**

2

| Plaintiff Finjan, Inc. | Finjan or Plaintiff |
|---|---|
| Defendant Blue Coat Systems LLC | Blue Coat or Defendant |
| U.S. Patent No. 6,154,844 | '844 patent |
| U.S. Patent No. 8,677,494 | '494 patent |
| U.S. Patent No. 6,965,968 | '968 patent |
| U.S. Patent No. 7,418,731 | '731 patent |
| Malware Analysis Appliance | MAA |
| Dynamic Real Time Rating | DRTR |
| Global Intelligence Network | GIN |
| *Finjan, Inc. v. Blue Coat Systems LLC*, No. 13-cv-03999-BLF (N.D. Cal. filed Aug. 28, 2013) | *Blue Coat I* |
| *Finjan, Inc. v. Blue Coat Systems LLC*, No. 13-cv-03999-BLF, Claim Construction Oder, Dkt. No. 118 | BC I CC Order |
| *Finjan, Inc. v. Blue Coat Systems LLC*, No. 15-cv-03295-BLF (N.D. Cal. filed July 15, 2015) | *Blue Coat II* |
| *Finjan, Inc. v. Sophos, Inc.*, No. 14-cv-01197-WHO (N.D. Cal.) | *Sophos* |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that at the Court's earliest convenience, or as soon thereafter as

4 the matter may be heard by the Honorable Beth Labson Freeman in Courtroom 3, United States

5 District Court for the Northern District of California, Robert F. Peckham Federal Building, 280

6 South 1st Street, San Jose, CA 95113, Defendant Blue Coat shall and hereby does respectfully

7 seek an order granting judgment as a matter of law.

8

This motion is based on this notice of motion and supporting memorandum, the trial

9 record, and such other written or oral argument as was presented and may be presented at or

10 before the time this motion is taken under submission by the Court.

11

## RELIEF REQUESTED

12

Blue Coat respectfully seeks an order granting it judgment as a matter of law on Finjan's

13 remaining claims for infringement, willful infringement, and worldwide damages.

14 Dated: December 8, 2017          MORRISON & FOERSTER LLP

15                                By:   */s/ Stefani E. Shanberg*

16                                      Stefani E. Shanberg

17                                      Attorneys for Defendant
                                       BLUE COAT SYSTEMS LLC

18

19

20

21

22

23

24

25

26

27

28

1

## I.      INTRODUCTION

2       A hung jury does not alter the Court's ability to grant judgment as a matter of law.  *See,*

3 *e.g., Zoltar Satellite Alarm v. Snaptrack, Inc.*, No. C 01-20291 JW, 2004 U.S. Dist. LEXIS

4 27713, at *6 (N.D. Cal. July 26, 2004) ("The jury did not reach a verdict on the claim. . . . The

5 Court finds that pursuant to Federal Rule of Civil Procedure 50, Defendants are entitled to

6 judgment as a matter of law on this infringement claim.").  A retrial on the '844 and '494 patents

7 is a waste of Court and party resources, because Finjan failed to introduce sufficient evidence for

8 a reasonable jury to find infringement as to those patents.  There was little disagreement about the

9 facts and the functionality of the accused products; rather, the parties focused on whether that

10 undisputed functionality meets the claim limitations, as construed by the Court.  *See generally TI*

11 *Group Auto. Sys. (N.A.) v. VDO N.A., LLC*, C.A. No. 00-432-GMS, 2002 U.S. Dist. LEXIS

12 17783 (D. Del. Sep. 4, 2002) (reversing jury's infringement findings under 50(b) based on

13 comparison of undisputed functionality to claim terms and noting that plaintiff's "arguments are

14 effectively an end-run around the court's rejection" of claim construction positions), *aff'd* 375

15 F.3d 1126 (Fed. Cir. 2004).  Finjan also failed to introduce substantial evidence of willfulness or

16 worldwide damages.  Finjan is not entitled to a second attempt to meet its burden of proof.  Blue

17 Coat respectfully requests that the Court deny Finjan's remaining claims for relief as a matter of

18 law.[1]

19 ## II.     LEGAL STANDARD

20       Judgment as a matter of law is appropriate when "a party has been fully heard on an issue

21 during a jury trial and the court finds that a reasonable jury would not have a legally sufficient

22 evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(b).  The Court may grant

23 judgment as a matter of law on claims where the jury was deadlocked.  *Headwaters Forest*

24 *Defense v. County of Humboldt*, 240 F.3d 1185, 1197 (9th Cir. 2000), *vacated on other grounds*,

25 534 U.S. 801 (2001); *see, e.g., Kalitta Air, LLC v. Cent. Tex. Airborne Sys.*, No. C 96-2494 CW,

26

27 ───────────────

28 [1] In light of the Court's guidance that the parties may wait until after the retrial to file Rule 50(b) motions, *see* Hr'g Tr. (11/21/17) at 16:6-9, Blue Coat has limited this motion to those issues that would obviate or narrow the scope of a retrial and has not included issues such as noninfringement of the '731 and '968 patents or other damages issues.

2005 U.S. Dist. LEXIS 43317, at *9 (N.D. Cal. Jul. 22, 2005) (On 50(b) motion, "[t]he fact that a mistrial was declared because of jury deadlock does not alter the standard to be applied."); *Zoltar Satellite Alarm*, 2004 U.S. Dist. LEXIS 27713, at *6. Indeed, the Court may grant JMOL anytime a party fails to support its burden with substantial evidence. *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) (citations omitted). "Substantial evidence is more than a scintilla of evidence." *Vectren Commc'n Servs. v. City of Alameda*, No. C 08-3137 SI, 2011 U.S. Dist. LEXIS 35523, at *5 (N.D. Cal. Mar. 22, 2011) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). While the Court "must view the evidence in the light most favorable to the non-moving party . . . and draw all reasonable inferences in [its] favor," "conclusory expert assertions do not give rise to a genuine issue of material fact." *Id.* at 1062; *Streck, Inc. v. Research & Diagnostic Sys.*, 665 F.3d 1269, 1290-91 (Fed. Cir. 2012) (upholding district court's grant of JMOL); *see also Volterra Semiconductor Corp. v. Primarion, Inc.*, 799 F. Supp. 2d 1092, 1098 (N.D. Cal. 2011) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.") (internal citations omitted).

## III.    NO LITERAL INFRINGEMENT OF THE '844 PATENT

### A.    Finjan Failed to Provide Evidence That the Accused Products Identify Suspicious Code.

Claim 15 of the '844 patent, the Court's claim construction, and the jury instructions require that "[a]s used in the patent, 'code' and 'operations' are not the same." JTX-3001 ('844 patent) at 11:64-66; BC I CC Order at 17; Dkt. No. 428, at 47. No reasonable jury could find infringement of the '844 patent based upon the evidence presented by Finjan, entitling Blue Coat to judgment as a matter of law of noninfringement.

At counsel's repeated prompting, Dr. Cole ignored the claim requirements and stated that "operations" are "the same thing" as suspicious code. *See*, *e.g.*, Trial Tr. (Cole) at 521:11-14 ("Q. And the suspicious operations, is that the same thing as identifying suspicious code?  A. Yes."); 527:5-7 ("Suspicious operations and suspicious code are both the same thing and it's in the file and looking for what actions the code would take that could be harmful."). Dr. Cole pointed to

only one alleged downloadable security profile:  MAA reports.  *See*, *e.g.*, *id*. at 520:5-521:10, 522:2-523:7, 527:8-528:8 (discussing PTX-368, PTX-564, and PTX-427).  In describing the contents of the MAA reports, Dr. Cole stated only that they list suspicious ***operations***, not code. *See*, *e.g.*, *id*. at 521:7-10 ("But these are all suspicious operations.  So Blue Coat's own document is showing you that it generates, it looks for and attracts these suspicious operations which forms the security profile."); *see also*, 522:17-20; 527:21-528:8.  Finjan failed to present any evidence that the accused products provide a downloadable security profile that identifies suspicious code.

Finjan now focuses on Dr. Cole's assertion that "suspicious operations map back to the code that actually performs those functions."  *Id.* at 521:15-16.  Whether or not correct, that is insufficient for infringement.  The Court addressed this issue in its claim construction order, recognizing Blue Coat's "concern that 'identifies' is too vague and could be interpreted to permit the downloadable security profile to simply detect the ***presence of suspicious code*** without further specifying its location or characteristics" and determining that "[t]his concern is well taken, and the Court agrees with Blue Coat that the patent requires the downloadable security profile ('DSP') to include ***details about the suspicious code*** in the received downloadable."  *Id.* (emphasis added).  It is undisputed that Dr. Cole did not point to any "details about the suspicious code in the received downloadable."

As Dr. Seth Nielson, Blue Coat's technical expert, explained in reference to the exemplary MAA report that Dr. Cole used in his testimony, none of the results listed in the MAA report identify code because "there's a lot of different ways, maybe an infinite number of ways, of writing code that can all cause the same event."  Trial Tr. (Nielson) at 1621:6-1622:12.  The mere fact that ***some*** code must have existed to cause an operation does not mean that one has identified that code, much less details about that code, upon identifying an operation, as there would be innumerable different code that could lead to any given operation.  *See id*.

Finjan attempted to buttress Dr. Cole's testimony by questioning Dr. Nielson and Mr. Rohan, a principal developer on MAA, with MAA reports that Dr. Cole never discussed.  These attempts fail because ***no*** MAA reports identify suspicious code.  The cross discussed certain MAA reports that list "Javascript: Eval method," "JavaScript: Unescape function," and similar

1   events observed during analysis.  *See, e.g.*, Trial Tr. (Nielson) at 1770:22-1773:1 (discussing

2   PTX-575); Trial Tr. (Rohan) at 1484:19-1485:8 (discussing PTX-575).  Mr. Rohan stated that

3   those functions are not considered suspicious by MAA—no JavaScript functions identified by

4   MAA are considered suspicious.  Trial Tr. (Rohan) at 1488:23-1489:17.  Mr. Rohan explained

5   that the JavaScript functions identified by MAA are performed by "a lot of the legitimate

6   programs," so these functions are ranked as risk score "6" or below, while MAA only considers

7   risk scores of "7" and above to be suspicious.  *See id.* at 1476:4-25 ("1 through 6 are behaviors

8   that are not suspicious."); 1485:7-1486:1, 1489:12-14; PTX-368 at BC2-0003663 (table of risk

9   scores for MAA and GIN showing that only "7" and above is "Suspicious behavior").  Absent

10   any contradictory testimony—or any testimony at all—from Dr. Cole on JavaScript functions

11   identified by MAA, Finjan has failed to present any evidence that MAA reports identify

12   suspicious code, as required by the '844 patent and this Court's claim construction.

**B.      Finjan Failed to Provide Evidence That the Accused Products Link a Downloadable Security Profile to a Downloadable Before a Web Server Makes the Content Available to Web Clients.**

15   Claim 15 of the '844 patent also requires "linking the first Downloadable security profile

16   to the Downloadable ***before a web server*** makes the Downloadable available to web clients,"

17   which the Court construed as requiring linking "***before a non-network gateway web server*** makes

18   the Downloadable available to web clients."  '844 patent at 11:64-12:2 (emphasis added).  In

19   construing this term, the Court recognized the arguments made by Finjan to obtain issuance of the

20   '844 patent and "that the '844 Patent contemplates a distinction between web servers and network

21   gateways."  BC I CC Order at 18-19 (citation to prosecution history omitted).

22   As discussed by Dr. Nielson, "a non-network gateway web server makes the

23   Downloadable available" by publishing it on the internet.  Trial Tr. (Nielson) at 1609:19-1610:1.

24   Examples of a "non-network gateway webserver" given during trial were espn.com and cnn.com.

25   *See* Dkt. 429.  This is consistent with an explicit embodiment in the patent in which a

26   downloadable is inspected and linked to its security profile before it is published by the web

27   server.  *See* '844 patent at Fig. 6; Trial Tr. (Nielson) at 1784:1-1788:2.

28   In order for any Blue Coat product to inspect a file, that file must have already been made

available by a web server.  *See, e.g.*, Trial Tr. (Cole) at 486:25-487:3 ("So what will happen is GIN will take the samples from the Internet and run them in a sandbox environment."); *see also*, *id.* (Mitzenmacher) at 626:14-19.  Blue Coat's products are not non-network gateway web servers, and they do not link a downloadable security profile to a downloadable before a web server makes that downloadable available.  *Id.* (Nielson) at 1613:7-13 ("The way the Blue Coat product works is that there's been a request for that content, that content has already been made available.").

Rather than provide any evidence contradicting these facts, Finjan attempted to avoid this issue by reading the word "web server" out of the claim and arguing that linking before a ***particular Blue Coat customer*** could access information constituted linking "before a web server makes the Downloadable available to ***web clients***."  It is undisputed that the Blue Coat products have no effect on whether the web server from which they downloaded a file for inspection has made and will continue to make that file available for web clients (plural).  Dr. Cole glossed over this distinction by repeatedly changing the claim language to "the web client" (singular) in order to imply that one must focus on a particular Blue Coat customer.  *See, e.g.*, Trial Tr. (Cole) at 485:20-21 ("[T]hat has to be linked to the downloadable before it's made available to ***the client***.") (emphasis added); *see also* 487:21-23, 498:16-18, 500:24-501:2, 501:5-9, 517:24-518:2, 528:18-529:8, 530:14-17, 533:13-25, 535:2-11, 536:11-16, 536:24-537:2.  Finjan attempted again to rewrite the claim when cross examining Dr. Nielson, but he pointed out the distinction and corrected Finjan's misreading of the claim.  Trial Tr. (Nielson) at 1690:5-1691:15.

Relying on passive voice and stating that the content "is made available," in over 50 transcript pages, Dr. Cole mentioned the web server only once:  when reading the claim language.  *Id.* (Cole) at 479:13-539:9.  This is a critical omission, as the claim requires a web server that takes action.  Failing to explain the role of the web server in the claim eviscerates the Court's construction and the patentee's disclaimer on which it is based.  As Dr. Nielson explained, "[i]f you've got a web server that is making content available, right, just because there is a Blue Coat product that may decide to block it for some clients, that doesn't change the fact that the webserver is already making it available. . . . The fact that an intermediary device is deciding to

1   block it doesn't change when that publishing happens."  Trial Tr. (Nielson) at 1612:25-1616:5.

2          Dr. Cole's presentation of argument and purported evidence that ignores the claim

3   language and this Court's constructions cannot sustain Finjan's burden of proof, and no

4   reasonable jury could rely on it to find infringement of these claim elements.  Blue Coat is

5   entitled to judgment of noninfringement as a matter of law.

6   **IV.    NO LITERAL INFRINGEMENT OF THE '494 PATENT**

7          Claim 10 of the '494 patent requires the accused system to derive security profile data of a

8   downloadable, including "a list of suspicious computer operations that may be attempted by the

9   Downloadable."  JTX 3006 ('494 patent) at 22:10-13; Trial Tr. (Cole) at 546:14-22.  Finjan

10  accused only the "Cookie2" string produced during DRTR inspection of meeting this limitation,

11  specifically through its two fields that correspond to 1) a count of how many YARA rules were

12  triggered, and 2) a concatenated string of the labels of those YARA rules.  Trial Tr. (Cole)

13  593:23-594:25.  Neither is a list of suspicious computer operations.  Based on this evidence, no

14  reasonable jury could find infringement of claim 10 of the '494 patent.

15         YARA rules are a popular open source tool used to scan files to match text strings.  *Id.* (C.

16  Larsen) at 1540:22-1541:14; *id.* (Nielson) at 1600:19-1601:11.  A YARA rule tests for text

17  strings that ***may implicate*** a particular suspicious computer operation, but even then, the label for

18  the YARA rule does not state what the operation is.  For that reason, a string of YARA rule labels

19  does not identify a suspicious computer operation.  A count of how many rules were triggered is

20  not a list of suspicious computer operations that might have caused them to trigger.

21         But Finjan's attempt to shoehorn the Cookie2 string into the asserted claim language has

22  even more flaws.  YARA rules often search for multiple different text strings and fire if any are

23  found in a file.  *See* PTX-516.  Knowing that a rule fired therefore does not indicate whether a

24  particular string is present in the file.  Trial Tr. (C. Larsen) at 1546:8-21.  Even if one were to

25  assume that a particular YARA rule corresponded to one particular text string, that does not mean

26  that when the YARA rule fires, a suspicious operation is present.  "YARA rules are about text

27  matching.  They match text."  Trial Tr. (Nielson) at 1601:12-14.  As Dr. Nielson explained, "it all

28  goes back to what a YARA rule is about.  A YARA rule is about finding pattern matches . . . . It's

1    about finding patterns in text . . . . The YARA rule is not identifying any operations." *Id.* at

2    1600:6-12.  A YARA rule would fire even if the matched string appears in displayed text or a

3    comment rather than the page code.  A web page describing an attack in its text could trigger a

4    YARA rule hit even though there is no suspicious operation in the file, because the YARA rule is

5    merely "looking for that text.  It's not looking for the operation." *Id.* at 1601:5-14.

6         Dr. Cole's unsubstantiated testimony is not evidence and is insufficient to support a

7    different conclusion.  Dr. Cole testified that "a concatenated string of the labels of the YARA

8    rules that were fired" was "a list of those suspicious operations that were found within the file."

9    Trial Tr. (Cole) at 551:24-552:6.  But he could not explain how particular YARA rule names

10   comprise a list of suspicious computer operations.

11        Dr. Cole pointed to only two specific YARA rules used by Blue Coat, both of which

12   demonstrate the flaws with Finjan's infringement theory.  First, Dr. Cole identified a rule called

13   "generic_javascript_obfuscation." stating that "this is JavaScript obfuscation detection."  Trial Tr.

14   (Cole) at 548:19-549:25; PTX-516 at 61.  But the label "generic_javascript_obfuscation" is not

15   the name of a suspicious operation—"obfuscation" refers to the manner in which code is written,

16   not what it is programmed to do—and, as discussed above, a list that includes this label would not

17   be a "list of suspicious computer operations."  *See* Trial Tr. (Cole) at 486:8-12 (obfuscation is

18   "where the adversary tries to hide or cover up what they did").  And, as Dr. Cole admitted, this

19   rule searches for three separate strings, Trial Tr. (Cole) at 549:13-25, and fires when ***any*** of them

20   are matched.  *See id.* (C. Larsen) at 1543:11-1546:21 ("We would know that this rule fired, but

21   that wouldn't tell us, well, which pattern did we see? . . . . So I wouldn't know which string it

22   found."); *id.* (Nielson) at 1599:23-1601:14 ("[T]here were multiple strings that could match, so

23   even there you wouldn't know which one of those matches fired, which pattern fired."); PTX-516

24   at 61 ("condition: any of them").  When asked about this rule on cross-examination, Chris Larsen,

25   the architect of DRTR and WebPulse, reiterated that while a label for the rule would be stored in

26   a database, "that's not going to tell you which pattern within the rule actually triggered."  Trial

27   Tr. (C. Larsen) at 1554:9-1556:16.  Dr. Cole did not address this fact and identified no rules that

28   correspond to a particular operation.

1    The only other rule to which Dr. Cole referred was "Unknown_JS_Injection_Patrik1."

2  PTX-516 at 155; Trial Tr. (Cole) at 550:3-21.  Dr. Cole provided only a single conclusory

3  statement regarding the search performed by this rule: "And this also is injection, which is

4  another type of suspicious operation that we would want to look for."  Trial Tr. (Cole) at 550:20-

5  21.  Dr. Cole did not explain why injection would be a suspicious computer operation that may be

6  attempted by the downloadable.  It is not.  In fact, this rule does not even belong to the "malware"

7  category of YARA rules.  *See id.* (C. Larsen) at 1543:25-1544:2; PTX-516 at 155 (showing that

8  "Unknown_JS_Injection_Patrik1" has no assigned category and a confidence rating of 5).

9  Neither of the rules discussed by Dr. Cole supported his opinion that YARA rule labels comprise

10 a list of suspicious computer operations.  In light of Dr. Nielson's uncontroverted opinion

11 explaining why YARA rule labels cannot comprise a list of suspicious code, Dr. Cole's single

12 conclusory statement regarding this rule cannot provide sufficient evidence that it meets the

13 requirements of claim 10 of the '494 patent.  Because Finjan presented no evidence that the

14 functionality it accused of infringing claim 10 of the '494 patent actually meets the claim

15 language, no reasonable jury could have found literal infringement, and Blue Coat is entitled to

16 judgment of noninfringement as a matter of law.

17 **V.    NO INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS**

18     Finjan failed to provide the jury with a legally sufficient basis for finding infringement of

19 the '844 patent or the '494 patent under the doctrine of equivalents.  Finjan's doctrine of

20 equivalents theories failed for the same reasons discussed with respect to literal infringement.

21 The technology that Finjan cites is fundamentally different than what the '844 and '494 patent

22 claim elements require, as discussed above.

23     Finjan's theories also failed because Finjan simply bootstrapped its arguments to its literal

24 infringement evidence, which the Federal Circuit has consistently held cannot satisfy a patentee's

25 evidentiary burden.  *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 347 F. Supp. 2d 114,

26 119 n.21 (D. Del. 2004) (An expert "cannot simply boot-strap his conclusions with respect to

27 literal infringement and extend them to the infringement under the Doctrine of Equivalents.")

28 (citing *Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989)).  An

equivalents argument "cannot merely be subsumed in plaintiff's case of literal infringement" and must be established by "particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device or process." *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1566-68 (Fed. Cir. 1996) (upholding grant of JMOL regarding doctrine of equivalents where "overwhelming majority of [expert's] testimony . . . was solicited for purposes of establishing literal infringement."). Finjan did not provide any such particularized testimony here.

As the Court recognized in hearing Blue Coat's Rule 50(a) motion for judgment as a matter of law on this point, "the testimony on DOE was rather skinny throughout [Finjan's] case." *Id.* at 1364:13-14. Finjan's equivalents testimony on each patent consisted of only a conclusory argument that a single element was met under the function/way/result test (Trial Tr. (Cole) at 538:8-539:9 ('844 patent); 552:18-553:20 ('494 patent)), repeating the same argument recited for literal infringement. *Compare, e.g.*, *id.* at 528:14-529:1 ('844 literal infringement discussion of linking to downloadable), *with id.* at 538:12-16 ('844 doctrine of equivalents discussion of linking to downloadable); *compare id.* at 551:24-552:15 ('494 literal infringement testimony regarding security profile and list of suspicious operations), *with id.* at 553:4-16 ('494 doctrine of equivalents testimony regarding same). Rather than presenting and supporting the doctrine of equivalents as a theory on its own merits, or even referring back to generally applicable technical background testimony, Finjan merely presented Dr. Cole's theory on each patent as a fallback to its literal infringement arguments. *See, e.g.*, *id.* at 538:8-9 ("So does GIN, **at the very least**, does GIN function in the same way as the second element of claim 15?"), 559:11-13 ("And **at the very least,** does GIN function in the same way – function in such a way that would be substantially similar to the third element of claim 10 of the '494 patent?") (emphases added).

Dr. Cole's doctrine of equivalents testimony was so thoroughly "subsumed in [Finjan]'s case of literal infringement" that he testified the alleged '844 equivalent is "exactly what GIN FRS with sandboxing does," and that the alleged '494 equivalent provides "exactly the functionality and output of the second claim element." *Texas Instruments*, 90 F.3d at 1566-68; Trial Tr. (Cole) at 539:7-9, 553:4-10. Finjan presents only conclusory evidence supporting this

1    theory and fails to provide the requisite "linking argument as to the insubstantiality of the

2    differences between the claimed invention and the accused device or process."   *Texas*

3    *Instruments*, 90 F.3d at 1566-68.

4         The only non-conclusory testimony on this issue confirms that the accused product

5    features are not equivalent to the missing claim elements.  Dr. Nielson explained the test he

6    applied and walked through his analysis of both patents in detail, discussing the purpose and

7    nature of the claims and where key differences arose.  Trial Tr. (Nielson) at 1626:12-1630:5

8    (testimony on '844 patent), 1601:15-1604:8 (testimony on '494 patent).  As to the '844 patent,

9    Dr. Nielson addressed both aspects of the principle disputed limitation.  First, he explained why

10   identifying suspicious operations is distinct from identifying suspicious code due to the potential

11   ameliorative actions available in each scenario.  *Id*. at 1627:1-1628:8.  Second, Dr. Nielson

12   discussed why performing security profile linking at a web server is not equivalent to doing so at

13   a gateway due to policy-setting abilities and limiting the distribution of malware.  *Id*. at 1628:13-

14   1630:5.  As to the '494 patent, Dr. Nielson concluded that because the claims are focused on

15   predicting what a downloadable is going to do, "whereas the YARA rules are focused on

16   signature matching and identifying previously identified malware . . . that has already been

17   identified . . . . The functions are different."  *Id.* at 1602:11-20.

18        Because Finjan's equivalents allegations fail as a matter of law, the Court should grant

19   judgment of noninfringement off the '844 and '494 patents under the doctrine of equivalents.

20   **VI.    NO WILLFUL INFRINGEMENT OF THE '844 AND '494 PATENTS**

21        To prove willful infringement, Finjan must show that Blue Coat's behavior was egregious,

22   such as where infringement is malicious, deliberate, consciously wrongful, or done in bad faith.

23   *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932-33 (2016).  Finjan did not

24   present evidence that came close to this standard.  Because Finjan did not introduce evidence

25   sufficient for a reasonable jury to find willful infringement of the '844 or '494 patent, the Court

26   should grant Blue Coat judgment as a matter of law of no willful infringement.  Supporting the

27   reasonableness of Blue Coat's position, the *Blue Coat II* jury assessed Finjan's evidence—which

28   was identical across all patents—and found no willful infringement of the two patents that it

1    found infringed, both of which were asserted in *Blue Coat I*.

2         Finjan's primary argument at trial—that Blue Coat did not make a good faith effort to

3    avoid infringing after the verdict in *Blue Coat I*—is unavailing.  The *Blue Coat I* verdict was a

4    lump sum award to compensate Finjan for Blue Coat's infringement for the life of the ***now-***

5    ***expired*** '844 patent, to which the ***now-expired*** '494 patent is terminally disclaimed.  At best,

6    Finjan can only recover for new functionality but Finjan presented no evidence to contradict Blue

7    Coat's reasonable belief that it did not infringe the asserted patents, or that Blue Coat's decision

8    not to design around after the *Blue Coat I* verdict establishes willfulness.  As such, it was

9    reasonable for Blue Coat to believe that it was allowed to continue providing its products.  *See*

10   Trial Tr. (Schoenfeld) at 1404:22-1405:4; 1406:7-1408:7.  That Blue Coat did not design around

11   expired patents for which it had already been assessed lump sum damages is not evidence of

12   willfulness, and there is no question that Blue Coat has the right to practice the patents today.

13        Further, the *Blue Coat I* verdict occurred ***after*** the filing of the *Blue Coat II* complaint,

14   and is therefore of limited, if any, relevance to willfulness in *Blue Coat II*.  *Radware, Ltd. v. F5*

15   *Networks, Inc.*, No. 5:13-cv-02024-RMW, 2016 U.S. Dist. LEXIS 112504, at *20-21 (N.D. Cal.

16   Aug. 22, 2016) (noting that "post-complaint conduct is of limited relevance" and that *Halo* did

17   not change this principle); *Monolithic Power Sys., Inc. v. Silergy Corp.*, 127 F. Supp. 3d 1071

18   (N.D. Cal. 2015).  And the '494 patent was not at issue in the first case.  At most, Finjan can

19   show that Blue Coat was ***aware*** of the asserted patents prior to the filing of *Blue Coat II*, but mere

20   awareness of a patent is insufficient to establish willfulness as a matter of law.  *See, e.g.*, *Finjan,*

21   *Inc. v. Cisco Sys.*, Case No. 17-cv-00072-BLF, 2017 U.S. Dist. LEXIS 87657, at *14-15 (N.D.

22   Cal. June 7, 2017) (dismissing willful infringement claim because pre-suit knowledge of patents

23   and infringement is insufficient) (quoting *Halo*, 136 S. Ct. at 1936 ("[T]he Court's references to

24   'willful misconduct' do not mean that a court may award enhanced damages simply because the

25   evidence shows that the infringer knew about the patent and nothing more.") (Breyer, J.,

26   concurring)).

27        The other exemplary factors in the Court's jury instruction on willful infringement further

28   support Blue Coat, not Finjan.  Finjan did not present substantial evidence that Blue Coat acted

1    inconsistently with the standards of behavior for its industry.  The sum total of Finjan's purported

2    evidence on this point was Dr. Cole's expert vouching regarding the unreasonableness of Blue

3    Coat's conduct after the *Blue Coat I* verdict, but that testimony does not constitute substantial

4    evidence.  *Streck*, 665 F.3d at 1290-91 (conclusory expert assertions insufficient to prevent

5    JMOL).  Dr. Cole's assertion that a company's only two options when it is "aware of an

6    infringement claim" are to take a license or to change its products, Trial Tr. (Cole) at 562:6-11, is

7    contrary to well-established legal principles permitting accused infringers to defend against

8    infringement claims without an automatic finding of willfulness.

9          Finjan also has no evidence that Blue Coat copied any product covered by any asserted

10   patent.  *See* Dkt. No. 381 at 8 ("Finjan presents no evidence or argument that specifically tie the

11   features that Blue Coat allegedly copied to these asserted claims").  Nor is there any evidence of a

12   "cover up."  To the contrary, Finjan's evidence regarding Blue Coat's competitive analysis of

13   Finjan's products shows standard industry practice that cannot establish willfulness.  Trial Tr.

14   (Schoenfeld) at 1421:23-1422:7.  As the Court recognized when evaluating Finjan's purported

15   evidence of copying pre-trial, competitive analysis is not unlawful.  *See* Dkt. No. 381 at 8 (noting

16   that "acquisition and testing of [Finjan technology] seems largely focused on comparing features

17   and performance to see which is more desirable for customers" and that this "seem[s] consistent

18   with regular, competitive behavior"); *see also Blue Coat I*, Dkt. No. 543 at 27 (noting that "[i]n

19   any competitive industry, businesses monitor and discuss their competitors").

20         No reasonable jury could conclude based on the evidence Finjan presented that Blue Coat

21   willfully infringes the '844 and '494 patents.  Blue Coat is entitled to judgment of no willful

22   infringement as a matter of law.

23   **VII.    NO WORLDWIDE DAMAGES ON THE '844 AND '494 PATENTS**

24         The Court instructed the jury that "[i]n regard to users outside the United States, you may

25   award damages only if you find that Finjan has proved that each of the claim elements of an

26   Asserted Claim is made and combined in the United States.  The law presumes that United States

27   patent law does not apply extraterritorially."  Dkt. No. 428 at 39.  Blue Coat objected to inclusion

28   of this instruction and continues to believe that whether Finjan is entitled to worldwide damages

1    is a question of law for the Court.  *See* Trial Tr. (Jury Instruction Conference) at 1705:13-18.  But

2    this issue should now be finally resolved because no reasonable jury could "find that Finjan has

3    proved that each of the claim elements of an Asserted Claim is made and combined in the United

4    States."  The Court and the jury heard the sum total of Finjan's evidence regarding foreign use of

5    Blue Coat's products.  Finjan should not be allowed another attempt at doubling its damages with

6    chants of "Made in the USA"—when that is not even the standard.  Judgment of no foreign

7    damages should be entered.

8         To recap, "[i]t is the general rule under United States patent law that no infringement

9    occurs when a patented product is made and sold in another country."  *Microsoft Corp. v. AT&T*

10   *Corp.*, 550 U.S. 437, 441 (2007) (no infringement under § 271(f) for master disks ***and electronic***

11   ***transmissions*** copied abroad); *Fr. Telecom S.A. v. Marvell Semiconductor Inc.*, 39 F. Supp. 3d

12   1080, 1099-1103 (N.D. Cal. 2014) (applying *Microsoft*'s reasoning in context of § 271(a)).  The

13   Supreme Court draws no distinction between software and physical components for determining

14   whether actions abroad qualify as infringement.  *Microsoft*, 550 U.S. at 453 ("The only true

15   difference between making and supplying software components and physical components [of

16   other patented inventions] is that copies of software are easier to make and transport.").

17        "The situs of the infringement is wherever an offending act of infringement is committed"

18   and "is a purely physical occurrence."  *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282,

19   1317 (Fed. Cir. 2005) (internal citations omitted).  "Under Section 271(a), there is a requirement

20   that there be an 'operable assembly' of the infringing products here before there can be liability."

21   *Eolas Techs. Inc. v. Microsoft Corp.*, No. 99 C 626, 2003 U.S. Dist. LEXIS 13482 at *3 (N.D. Ill.

22   Aug. 1, 2003) (internal citations omitted); *see also Centillion Data Sys. LLC v. Quest Commcn's*

23   *Int'l*, 631 F.3d 1279, 1288 (Fed. Cir. 2011) ("In order to 'make' the system under § 271(a),

24   [Defendant] would need to ***combine all of the claim elements*** – this it does not do.  The

25   customer, not [Defendant], completes the system by providing the 'personal computer data

26   processing means' and ***installing the client software***.") (emphasis added).

27        For software, as the Supreme Court found in *Microsoft*, manufacture requires the final

28   copy of the software that is installed on the end users' computer.  *Microsoft*, 550 U.S. at 457-59.

1  Compiling software in the United States is not enough to find infringement under § 271(a).  *See*

2  *Research Corp. Techs., Inc. v. Microsoft Corp.*, No. CV-01-658-TUC-RCJ, 2009 U.S. Dist.

3  LEXIS 135255, at *59 (D. Ariz. 2009) ("***Software by itself cannot infringe*** the apparatus claims.

4  Direct infringement of a device, product, apparatus or system claim occurs only when that person

5  ***actually makes . . . the apparatus containing each and every limitation of the claim***.").  Both the

6  Federal Circuit and the Supreme Court have forcefully applied the presumption against

7  extraterritoriality in patent contexts.  *Microsoft*, 550 U.S. at 454-55 ("The presumption that

8  United States law governs domestically but does not rule the world applies with particular force

9  in patent law."); *see Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,

10  711 F.3d 1348, 1371-72 (Fed. Cir. 2013) ("[T]he presumption against extraterritorial application

11  would be a craven watchdog indeed if it retreated to its kennel whenever ***some*** domestic activity

12  is involved in the case") (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010))

13  (emphasis in original).

14      Other than repeated reliance on the incorrect standard regarding benefit and control—

15  which has been rejected by the Court—the only evidence Finjan provided at trial in support of its

16  alleged entitlement to damages based on worldwide users is the assertion that GIN is developed

17  and compiled in the United States.  *See, e.g.*, Trial Tr. (Cole) at 536:7-10 (testifying GIN is

18  developed in Draper, Utah); *id.* at 597:17-19; *id.* (Mitzenmacher) at 765:3-12 (same); *id.*

19  (Medvidovic) at 982:22-983:13, 1052:2-21 (same); *id.* at 889:9-23 (Counsel reading RFAs

20  regarding development of GIN); *see also id.* at 962:8-10 (Court rejecting benefit and control

21  theory).  This is insufficient as a matter of law for Finjan to show infringement by foreign users of

22  GIN such that Finjan may be awarded damages for foreign users.  *See, e.g.*, *Microsoft*, 550 at

23  444-45 (holding no infringement even though accused software "is designed, authored, and tested

24  at Microsoft's Redmond, Washington, headquarters").

25      Finjan asserts two system claims requiring a combination of hardware and software for

26  infringement.  As Finjan argued to the Federal Circuit, the '844 patent would be patent-ineligible

27  if they were directed to disembodied software.  *See* Response Brief for Plaintiff-Appellee Finjan,

28  Inc., *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 2016-2520, Dkt. No. 41 at 25 (filed Jan. 30, 2017)

1   ("Independent Claim 15 adds *specific and concrete components* within an 'inspector system,'

2   including a separate '*memory* storing a first rule set' to be used by a 'content inspection engine . .

3   . to generate a first Downloadable security profile.") (emphasis added).  Finjan made a similar

4   argument relating to the '494 patent in its Opposition to Blue Coat's Motion for Judgment on the

5   Pleadings Under 35 U.S.C. § 101.  *See* Dkt. No. 109 at 11-12 ("Claim 10 [of the '494 patent]

6   further avoids preemption by including additional *specific concrete components* contained within

7   a "system for managing Downloadables," including "a *receiver* for receiving an incoming

8   Downloadable. . .  The receiver is coupled to a "Downloadable Scanner" . . . the Downloadable

9   Scanner is coupled with a "database manager," which is used for "storing the Downloadable

10  security profile data in a *database*.").  Finjan provided no evidence that GIN's software is

11  combined with the required hardware in the United States.  Rather, the uncontroverted evidence

12  presented to the jury established that foreign GIN users use hardware that is combined abroad

13  with software downloaded from the closest foreign data center.  *See, e.g.*, *id.* (Schoenfeld) at

14  1390:17-1401:14; JTX-3062.  Accordingly, there can be no damages for foreign users.

15  **VIII.   CONCLUSION**

16       For the reasons above, Blue Coat respectfully requests that the Court enter judgment as a

17  matter of law of noninfringement of the '844 and '494 patents.  At a minimum, judgment as a

18  matter of law should be entered of no worldwide damages for the '844 and '494 patents.

19

20  Dated: December 8, 2017                    MORRISON & FOERSTER LLP

21                                             By:    */s/ Stefani E. Shanberg*
                                                      Stefani E. Shanberg
22

23                                             Attorneys for Defendant
                                               BLUE COAT SYSTEMS LLC
24

25

26

27

28