PAUL J. ANDRE (State Bar No. 196585)
pandre@kramerlevin.com
LISA KOBIALKA (State Bar No. 191404)
lkobialka@kramerlevin.com
JAMES HANNAH (State Bar No. 237978)
jhannah@kramerlevin.com
HANNAH LEE (State Bar No. 253197)
hlee@kramerlevin.com
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 752-1700
Facsimile: (650) 752-1800

*Attorneys for Plaintiff*
FINJAN, INC.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

FINJAN, INC., a Delaware Corporation,

Plaintiff,

v.

BLUE COAT SYSTEMS, INC., a Delaware Corporation,

Defendant.

Case No.: 15-cv-3295-BLF-SVK

**PLAINTIFF FINJAN, INC.'S NOTICE OF MOTION AND PARTIAL RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b)**

Date: TBD
Time: TBD
Place: Courtroom 3, 5th Floor
Before: Hon. Beth Labson Freeman

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ..... 1

RELIEF REQUESTED ..... 1

I. LEGAL STANDARD ..... 1

II. FINJAN IS ENTITLED TO JMOL THAT BLUE COAT INFRINGES THE '844 PATENT ..... 2

III. FINJAN IS ENTITLED TO JMOL THAT BLUE COAT INFRINGES THE '494 PATENT ..... 4

IV. FINJAN IS ENTITLED TO JMOL THAT BLUE COAT WILLFULLY INFRINGES THE '844 AND '494 PATENTS ..... 6

V. FINJAN IS ENTITLED TO JMOL THAT BLUE COAT OWES DAMAGES FOR INFRINGEMENT OF THE '844 OF AT LEAST $29.8 MILLION AND DAMAGES FOR INFRINGEMENT OF THE '494 PATENT OF AT LEAST $16.2 MILLION ..... 8

VI. CONCLUSION ..... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Tex., LLC v. BMW N. Am., LLC*,
783 F. Supp. 2d 891 (E.D. Tex. 2011) ........ 7

*Card-Monroe Corp. v. Tuftco Corp.*,
No. 1:14-cv-292, 2017 WL 3841878 (E.D. Tenn. Sept. 1, 2017) ........ 11

*Carnegie Mellon Univ. v. Marvell Tech. Grp. Ltd.*,
807 F.3d 1283 (Fed. Cir. 2015) ........ 10

*CNET Networks, Inc. v. Etilize, Inc.*,
528 F. Supp. 2d 985 (N.D. Cal. 2007) ........ 11

*Decca Ltd. v. U.S.*,
210 Ct. Cl. 546 (Ct. Cl. 1976) ........ 12

*E.E.O.C. v. Go Daddy Software, Inc.*,
581 F.3d (9th Cir. 2009) ........ 2

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
No. 13-cv-05038 NC, 2016 WL 4208236 (N.D. Cal. Aug. 10, 2016) ........ 2

*Goulds' Mfg. Co. v. Cowing*,
105 U.S. 253 (1881) ........ 11

*Graver Tank & Mfg. Co., v. Linde Air Prods. Co.*,
339 U.S. 605 (1950) ........ 3

*Greatbatch Ltd. v. AVX Corp.*,
No. 13-723-LPS, 2016 WL 7217625 (D. Del. Dec. 13, 2016) ........ 6

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
136 S.Ct. 1923 (2016) ........ 6

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
No. 4:14-cv-371, 2017 WL 4038884 (E.D. Tex. Sept. 13, 2017) ........ 7

*MobileMedia Ideas LLC v. Apple Inc.*,
780 F.3d 1159 (Fed. Cir. 2015) ........ 3, 5

*Nat'l Presto Indus., Inc. v. W. Bend Co.*,
76 F.3d 1185 (Fed. Cir. 1996) ........ 3

*NTP, Inc. v. Research in Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005)........................................................................................ 12

*Paice LLC v. Toyota Motor Corp.*,
504 F.3d 1293 (Fed. Cir. 2007).......................................................................................... 4

*Railroad Dynamics, Inc. v. A. Stuki Co.*,
727 F.2d 1506 (Fed. Cir. 1984)........................................................................................ 11

*Roche Palo Alto LLC v. Apotex, Inc.*,
526 F. Supp. 2d 985 (N.D. Cal. 2007), *aff'd*, 531 F.3d 1372 (Fed. Cir. 2008)................................ 10

*Shum v. Intel Corp.*,
630 F. Supp. 2d 1063 (N.D. Cal. 2009) ................................................................................ 1

*Tyco Healthcare Grp., LP v. Applied Med. Res. Corp.*,
No. 9:06-cv-151, 2009 WL 5842063 (E.D. Tex. Mar. 30, 2009) ...................................................... 7

*Warner-Jenkinson Co., v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997)............................................................................................................ 3

*WMS Gaming Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999).......................................................................................... 6

**Statutes**

35 U.S.C. § 271(a) ......................................................................................... 10, 11, 12

35 U.S.C. § 284..................................................................................................................... 8

**Other Authorities**

Federal Rule of Civil Procedure 50 ..................................................................... 1, 6, 16

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that as soon as the matter may be heard by the Court, Finjan, Inc. ("Finjan") will and hereby does move the Court for an order granting its partial renewed motion for judgment as a matter of law. This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the trial record, the pleadings and papers on file, and any evidence and argument presented to the Court.

**RELIEF REQUESTED**

Pursuant to the Federal Rule of Civil Procedure 50(b), Finjan moves for renewed judgment as a matter of law ("JMOL") that: (1) Blue Coat infringes U.S. Patent No. 6,154,844 ("the '844 Patent") and U.S. Patent No. 8,677,494 ("the '494 Patent"); (2) Blue Coat's infringement was and continues to be willful; and (3) Blue Coat owes damages of no less than a reasonable royalty for infringement of the '844 Patent and '494 Patent, i.e. $29.8 million and $16.2 million respectively. Blue Coat failed to present a legally sufficient evidentiary basis to support its defenses to the foregoing. For such reasons as discussed in detail below, the Court should grant Finjan's renewed motion for judgment as a matter of law[1].

## I. LEGAL STANDARD

Fed. R. Civ. P. 50(b) states that a party may move for a renewed motion for judgment as a matter of law no later than 28 days after the jury was discharged if the motion addresses a jury issue not decided by a verdict. "Where the jury has not reached a verdict, the failure to reach a verdict does not necessarily preclude a judgment as a matter of law." *Shum v. Intel Corp.*, 630 F. Supp. 2d 1063, 1072 (N.D. Cal. 2009) (citations omitted). Judgment as a matter of law is appropriate if the Court views the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor, and if "the court finds that a reasonable jury would not have a legally

[1] Finjan will move for renewed judgment as a matter of law on remaining issues set forth in its Rule 50(a) motion after the Court's entry of judgment. *See* Fed. R. Civ. P. 50(b) (a party may move for a renewed motion for judgment as a matter of law "[n]o later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged . . ."); Nov. 21, 2017 Hearing Tr. at 15:22-16:12.

sufficient evidentiary basis to find for the party on [an] issue.'" *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d, 951, 961 (9th Cir. 2009); *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, No. 13-cv-05038 NC, 2016 WL 4208236, at *1 (N.D. Cal. Aug. 10, 2016) (citing Fed. R. Civ. P. 50(b)).

## II. FINJAN IS ENTITLED TO JMOL THAT BLUE COAT INFRINGES THE '844 PATENT

Blue Coat failed to present the jury with legally sufficient evidence that GIN/WebPulse does not infringe Claim 15 of the '844 Patent. *See* Dkt. No.[2] 423 at 3, 11-13; Dkt. No. 459 at 1-3, 10-11; Trial Tr. at 1713:7-1734:15. Accordingly, Finjan is entitled to JMOL that Blue Coat infringes the '844 Patent.

Finjan presented substantial evidence at trial demonstrating GIN/WebPulse literally infringes the '844 Patent, and Blue Coat failed to present legally sufficient evidence to rebut this evidence. Finjan presented numerous Blue Coat documents, source code, witness testimony, expert testimony and testing of the Accused Products establishing that GIN/Webpulse meets the preamble and Elements 1-2 of Claim 15 of the '844 Patent (preamble: ( "*[a]n inspector system comprising*"); Element 1: "*memory storing a first rule set*"; and Element 2: "*a first content inspection engine for using the first rule set to generate a first Downloadable security profile that identifies suspicious code in a Downloadable, and for linking the first Downloadable security profile to the Downloadable before a web server makes the Downloadable available to web clients*"). Specifically, Finjan presented substantial evidence that GIN/WebPulse is an inspector system (Trial Tr. at 501:22-504:14; PTX-105; JTX-3043), contains a memory with a rule set (Trial Tr. at 504:15-514:17; PTX-1025; PTX-290; PTX-295; Larsen testimony (PTX-1276 at 106:8-13, 110:16-20); PTX-575); and contains a content inspection engine that generates a profile identifying suspicious code and links the profile before making the downloadable available (Trial Tr. at 514:18-515:3, 517:11-537:13; PTX-1274; PTX-49; PTX-368; PTX-423; PTX-427; PTX-564; PTX499; PTX-1025; and JTX-3050). *See also* Trial Tr. at 469:16-539:9, 560:9-23, 565:14-591:9, 603:18-605:11.

At trial, Blue Coat only challenged infringement of Element 2 with the unsupported, conclusory opinion of Dr. Nielson, who did not cite any exhibits or witness testimony (aside from

[2] Unless indicated otherwise, all "Dkt. No." cites herein are to the filed pleadings in this litigation.

PTX564 to show that the MAA reports also show information that is not code). Trial Tr. at 1618:16-18, 1626:8-11; *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015) ("Conclusory statements by an expert, however, are insufficient to sustain a jury's verdict"). Blue Coat's expert also did not apply the plain meaning of the claim or apply the claim language as construed by the Court. During cross examination, Blue Coat's expert, Dr. Nielson, stated that he interpreted the claim language in a manner inconsistent with the plain meaning of the claims as one of ordinary skill in the art would, as well as did not apply the Court's claim construction for the terms in the case. He did not apply the plain meaning and the Court's construction for the '844 claim element "a first content inspection engine for using the first rule set to generate a first Downloadable security profile that identifies suspicious code in a Downloadable, and for linking the first Downloadable security profile to the Downloadable before a web server makes the Downloadable available to web clients." *See e.g.*, Trial Tr. at 1606:13-1610:1, 1612:6-1626:11, 1798:25-1800:20, and 1806:19-24.

Finjan also presented substantial evidence that Blue Coat infringes Claim 15 (Element 2) of the '844 Patent under the doctrine of equivalents. Trial Tr. at 469:16-496:21, 537:14-539:9; JTX-3001; JTX-3007; JTX-3043; JTX-3050; PTX-49; PTX-423; PTX-54; PTX-216; PTX-199; PTX-368; PTX-423; PTX-427; PTX-460; PTX-499; PTX-564; PTX-1025; PTX-1274. Equivalency is the "substantial sameness of the patented invention and the accused composition," and there is no particular formula of evidence or argument required to establish infringement under the doctrine of equivalents. *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1191 (Fed. Cir. 1996); *see also Warner-Jenkinson Co., v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24-25 (1997) (citing *Graver Tank & Mfg. Co., v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950) ("Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect")).

Finjan's expert, Dr. Cole, testified at length in support of his opinion that Blue Coat infringes the '844 Patent under the doctrine of equivalents, including providing expert testimony regarding the background of the invention and the functionality of GIN/Webpulse, an element-by-element analysis of literal infringement of the '844 Patent, and additional testimony regarding infringement of the '844

Patent under the doctrine of equivalents. Trial Tr. at 469:16-496:21, 537:14-539:9; JTX-3001; JTX-3007; JTX-3043; JTX-3050; PTX-49; PTX-423; PTX-54; PTX-216; PTX-199; PTX-368; PTX-423; PTX-427; PTX-460; PTX-499; PTX-564; PTX-1025; PTX-1274. It is not necessary to draw a "line in the sand" between Dr. Cole's testimony regarding infringement under the doctrine of equivalents and other relevant testimony he provided to the jury regarding literal infringement, the patent, or the technology of the Accused Product. *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007) (a witness may incorporate earlier testimony regarding literal infringement and the accused product as part of testimony regarding infringement under doctrine of equivalents to avoid duplication). The only evidence Blue Coat presented to rebut Finjan's substantial evidence of infringement are statements from Dr. Nielson, without citing any exhibits or witness testimony, that what Finjan accused is not equivalent. Trial Tr. at 1626:12-1630:5. Thus, Blue Coat failed to present legally sufficient evidence to rebut the evidence of infringement under the doctrine of equivalents.

Based on the substantial evidence of infringement of the '844 Patent, and the lack of legally sufficient rebuttal evidence from Blue Coat, Finjan is entitled to JMOL that GIN/WebPulse infringes Claim 15 of the '844 Patent, literally or, alternatively, under the doctrine of equivalents.

## III. FINJAN IS ENTITLED TO JMOL THAT BLUE COAT INFRINGES THE '494 PATENT

Blue Coat failed to present the jury with legally sufficient evidence that GIN/WebPulse does not infringe Claim 10 of the '494 Patent. *See* Dkt. No. 423 at 3-4, 11-13; Dkt. No. 459 at 4-5, 10-11; Trial Tr. at 1713:7-1734:15. Accordingly, Finjan is entitled to JMOL that Blue Coat infringes the '494 Patent.

Finjan presented substantial evidence demonstrating that GIN/WebPulse literally infringes the '494 Patent. During trial, Finjan presented numerous Blue Coat documents, source code, witness testimony, expert testimony and testing of the Accused Products establishing that GIN/Webpulse satisfies the preamble and Elements 1-3 of Claim 10 of the '494 Patent (preamble: "*a system for managing Downloadables, comprising*"); Element 1: "*a receiver for receiving an incoming Downloadable*"; Element 2: "*a Downloadable scanner coupled with said receiver, for deriving security profile data for the Downloadable, including a list of suspicious computer operations that may*

*be attempted by the Downloadable; and*"; Element 3: "*a database manager coupled with said Downloadable scanner, for storing the Downloadable security profile data in a database*"). Specifically, Finjan presented substantial evidence that: GIN/WebPulse contains a system for managing downloadables (Trial Tr. at 501:22-504:14, 540:18-543:12); contains a receiver for incoming downloadables (Trial Tr. at 542:14-546:13; PTX-105; and PTX-1025); contains a scanner for deriving security profile information from downloadables, including a list of suspicious operations (Trial Tr. at 546:14-552:17; PTX-211; PTX-516; JTX-3060); and contains a database manager for storing security profile in a database (Trial Tr. at 554:11-559:10; JTX-3050; deposition testimony of Chris Larsen; PTX-211; and PTX-1025). *See also* Trial Tr. at 469:16-496:21, 540:18-560:8. 565:14-605:11.

Blue Coat challenged only Element 2 of Claim 10 of the '494 Patent with nothing but the conclusory, unsupported opinion of Dr. Nielson, who did not cite any exhibits or witness testimony. Trial Tr. at 1592:20, 1597:7-12, 1598:1-2, 1603:19-21; *MobileMedia Ideas LLC*, 780 F.3d at 1172 ("Conclusory statements by an expert, however, are insufficient to sustain a jury's verdict"). In doing so, Dr. Nielson failed to apply the plain and ordinary meaning and the Court's construction for the '494 elements "a Downloadable scanner coupled with said receiver, for deriving security profile data for the Downloadable, including a list of suspicious computer operations that may be attempted by the Downloadable" and "a database manager coupled with said Downloadable scanner, for storing the Downloadable security profile data in a database." *See e.g.*, Trial Tr. at 1597:22-1600:16. Thus, Blue Coat failed to present legally sufficient evidence to rebut the evidence of literal infringement.

Finjan also presented substantial evidence that Blue Coat infringes Element 2 of Claim 10 of the '494 Patent under the doctrine of equivalents. Trial Tr. at 469:16-496:21, 540:18-542:13, 552:18-554:10, 559:11-560:8; PTX-211; PTX-516; JTX-3060; PTX-1274; PTX-368; PTX-564; PTX-499; PTX-1025; PTX-427; JTX-3050; PTX-423; JTX-3043; PTX-49; PTX-216; and JTX-3001.

Finjan's expert, Dr. Cole, testified at length that Blue Coat infringes the '494 Patent under the doctrine of equivalents, including providing expert testimony regarding the background of the invention and the functionality of GIN/Webpulse, an element-by-element analysis of literal

infringement of the ‘494 Patent, and additional testimony regarding infringement of the ‘494 Patent under the doctrine of equivalents. The only evidence Blue Coat presented to rebut Finjan’s substantial evidence is statements from Dr. Nielson, without citing any exhibits or witness testimony, that what Finjan accused is not equivalent. Trial Tr. at 1601:15-1602:20. Thus, Blue Coat failed to present legally sufficient evidence to rebut the evidence of infringement under the doctrine of equivalents.

Based on the substantial evidence of infringement of the ‘494 Patent, and the lack of legally sufficient evidence from Blue Coat purportedly supporting non-infringement, Finjan is entitled to JMOL that GIN/WebPulse infringes Claim 10 of the ‘494 Patent, literally or, alternatively, under the doctrine of equivalents.

## IV. FINJAN IS ENTITLED TO JMOL THAT BLUE COAT WILLFULLY INFRINGES THE ‘844 AND ‘494 PATENTS

At trial, Finjan proved, by a preponderance of evidence, that Blue Coat willfully infringed and continues to infringe Claim 15 of the ‘844 Patent and Claim 10 of the ‘494 Patent. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S.Ct. 1923, 1934 (2016); *Greatbatch Ltd. v. AVX Corp.*, No. 13-723-LPS, 2016 WL 7217625, at *3 (D. Del. Dec. 13, 2016). Blue Coat failed to present legally sufficient evidence to rebut the substantial evidence of willful infringement. Fed. R. Civ. P. 50(b).

Willfulness is shown when the infringer knew of the patents and engaged in infringement that is malicious, deliberate, consciously wrongful or in bad faith. *WMS Gaming Inc. v. Int’l Game Tech.*, 184 F.3d 1339, 1354 (Fed. Cir. 1999) (finding willfulness based on totality of circumstances when infringer knew of the patent and its significance and made no effort to design around it).

It is undisputed that Blue Coat had knowledge of the ‘844 and ‘494 Patents before July 15, 2015, the date this action commenced, and made no efforts to design around these patents in the development of GIN/Webpulse. In the Pretrial Statement and Order, Blue Coat stipulated that it knew of the ‘844 Patent since August 28, 2013 (the date of the Complaint in the *Finjan, Inc. v. Blue Coat Sys., Inc.*, 13-cv-03999-BLF (N.D. Cal.) previous litigation (“*Blue Coat I*”)) and that it knew of the ‘494 Patent since at least May 1, 2014 (when the parties filed a Second Joint Case Management Statement in *Blue Coat I*). Dkt. No. 359 at 8. It also stipulated it would not present any evidence at trial regarding non-infringing alternatives or design-arounds. *Id.* at 13. Despite the fact Blue Coat had

known of the '844 and '494 Patents for years, and a jury found on August 4, 2015 that Blue Coat infringed the '844 Patent in *Blue Coat I*, it decidedly elected to take affirmative steps to continue to infringe the '844 Patent by implementing new technology in GIN (FRS), and infringe the '494 Patent by implementing new technology in Webpulse (YARA). Trial Tr. at 471:3-17; 482:5-483:23; 486:19-487:23, 488:24-491:12, 496:25-497:3, 539:11-24; 542:14-24; 543:13-19; 547:3-13; 548:12-549:12; 551:1-23; 553:25-554:10; 555:12-25; 560:18-23; 587:21-25; 590:8-591:1; 595:1-14, 1411:4-1414:12; PTX-55; PTX-48; PTX-49; PTX-211; PTX-516; JTX-3060; PTX-55; JTX-3043; JTX-3050; *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, No. 4:14-cv-371, 2017 WL 4038884, at *3 (E.D. Tex. Sept. 13, 2017) ("Following a jury verdict and entry of judgment of infringement and no invalidity, a defendant's continued infringement will be willful absent very unusual circumstances") (citing *Affinity Labs of Tex., LLC v. BMW N. Am., LLC*, 783 F. Supp. 2d 891, 899 (E.D. Tex. 2011)).

Other fact and expert testimony at trial showed Blue Coat has willfully infringed the '844 and '494 Patent since at least 2015 when the new GIN/Webpulse technology was implemented. *Id.* Mr. Schoenfeld, Blue Coat's Senior Vice President of Product Management, testified that Blue Coat did nothing to substantively change its products following the jury's verdict of infringement in *Blue Coat I*. Trial Tr. at 1404:17-1405:4, 1406:15-1407:5, 1409:24-1410:16; 2005:9-13. Blue Coat's argument at trial that it thought the *Blue Coat I* verdict gave it a right to use GIN/Webpulse without taking a license to the '844 and '494 Patents is directly contradicted by the trial testimony of Mr. Schoenfeld who confirmed that Blue Coat knew it did not receive a portfolio license to all of Finjan's patents and the *Blue Coat I* verdict was limited to the specific products at issue in that case which are different from the products accused here. Trial Tr. at 1406:12-1407:5.

Finjan also presented unrebutted expert testimony from Dr. Cole that no reasonable company in the computer security industry would have increased its infringement, as Blue Coat did, while a patent case is pending against it. Trial Tr. 463:20-469:11; 562:12-16; *Tyco Healthcare Grp., LP v. Applied Med. Res. Corp.*, No. 9:06-cv-151, 2009 WL 5842063, at *2-3 (E.D. Tex. Mar. 30, 2009) (holding evidence of standard industry practice is relevant to analysis of willful infringement). Rather than act as Blue Coat did, Dr. Cole testified that a reasonable computer security company would get a license,

reduce the infringing technology or create next generation products that do not infringe. Trial Tr. at 562:12-18. Dr. Cole provided further unrebutted testimony that a reasonable company would not continue developing and releasing products containing infringing technologies after a verdict of infringement against the company. Trial Tr. at 562:24-564:5.

Other circumstantial evidence at trial showed that Blue Coat willfully infringed Finjan's '844 and '494 Patents. Finjan presented evidence, including Blue Coat's internal e-mails in 2011, demonstrating that Blue Coat had secretly obtained Finjan's patented technology in its M86 licensee's product and, after analysis, identified the features in Finjan's technology that Blue Coat should incorporate into its products. Trial Tr. at 1414:15-1420:23; PTX-929; PTX-113.

Despite arguing that Blue Coat could not have willfully infringed as the infringing technology in *Blue Coat I* was purportedly identical to the accused technology in this case, Blue Coat provided no evidence, from fact or expert witnesses, to support this argument. As discussed above, the evidence showed that Blue Coat implemented new technology, and did not have a license to all of Finjan's patents by way of the jury verdict in *Blue Coat I*. Based on the substantial evidence Finjan presented and the lack of evidence provided by Blue Coat to rebut the evidence of willfulness, Finjan requests the Court grant judgment as a matter of law that Blue Coat willfully infringes the '844 and '494 Patents.

## V. FINJAN IS ENTITLED TO JMOL THAT BLUE COAT OWES DAMAGES FOR INFRINGEMENT OF THE '844 OF AT LEAST $29.8 MILLION AND DAMAGES FOR INFRINGEMENT OF THE '494 PATENT OF AT LEAST $16.2 MILLION

Finjan presented substantial evidence at trial that it is entitled to damages in the amount of no less than a reasonable royalty for Blue Coat's infringement of the '844 and '494 Patents pursuant to 35 U.S.C. § 284. Finjan presented evidence supporting a reasonable royalty of damages through numerous exhibits and both fact and expert testimony, including testimony from its damages expert, technical experts, and Finjan's President. Blue Coat failed to present sufficient evidence to rebut Finjan's evidence of damages.

Specifically, as discussed below, Finjan presented substantial evidence that there are 175 million users of the infringing FRS component of GIN/Webpulse, which is 1/46 of the GIN/Webpulse

product. Finjan also presented substantial evidence that there are 75 million users of the infringing DRTR technology of GIN/Webpulse, and 2.7% of the incoming web traffic to GIN/Webpulse goes to the recent version of DRTR (that was not previously accounted for in the jury's damages award in *Blue Coat I*). Finjan also presented substantial evidence that a reasonable licensing fee for the '844 and '494 Patents is $8/user consistent with an 8-16% royalty rate that Finjan uses in its licensing practices. As a result, the jury heard substantial evidence, which Blue Coat failed to rebut with sufficient evidence, that it should award damages of no less than $29.8 million for Blue Coat's infringement of the '844 Patent, and no less than $16.2 million for Blue Coat's infringement of the '494 Patent.

Finjan's damages expert, Dr. Meyer, testified about her expert opinions, based on Blue Coat's documents and witnesses, Finjan's documents and witnesses, industry publications and testimony of Finjan's technical experts. Trial Tr. at 1189:14-1227:21, 1234:20-1242:1; PTX-727; PTX-743; PTX-744; PTX-245; JTX-3080; PTX-55; PTX-526; JTX-3050; PTX-1283. Dr. Meyer testified that the hypothetical negotiation dates are (as agreed to by the parties) were: March 18, 2014 for the '494 Patent and July 15, 2015 for the '844 Patent. Trial Tr. at 1187:19-1188:10; Dkt. Nos. 384, 393. She also testified that a user-based methodology for determining a reasonable royalty for infringement of the '844 Patent by the FRS component of GIN/Webpulse was appropriate based on evidence presented in the case including Finjan's President's testimony regarding a royalty rate of $8 per user, the importance and value of GIN/WebPulse, and Finjan's technical expert's testimony regarding the architectural components of GIN/WebPulse including the fact that FRS is 1 out of 46 features of GIN along with all the trial testimony that there are 175 million users of GIN. Trial Tr. at 768:14-769:11, 831:4-832:2, 886:24-887:1, 1081:2-1084:8, 1183:1-20, 1215:17-1219:20, 1234:23-1236:1, 1240:2-11, 1241:22-1242:1, 1256:1-1264:11, 1355:20-1357:11; 1410:18-23; PTX-526; JTX-3050.

Dr. Meyer also testified regarding the appropriate reasonable royalty for Blue Coat's infringement of the '494 Patent by GIN/Webpulse was $16.2 million under a user-based methodology using 75 million users and apportioning $8/user by 2.7% of the traffic to the infringing DRTR component of GIN/Webpulse. Trial Tr. at 1058:18-1060:16, 1259:8-1262:25; JTX-3050. The 2.7% traffic was calculated by removing 4.0% traffic that was accounted for in *Blue Coat I* from the total

6.7% traffic to DRTR that exists after the infringing components (DRTR/YARA) were added to GIN/Webpulse. Finjan presented substantial evidence supporting its assertions regarding the increase in traffic to GIN/Webpulse after the addition of YARA rules to DRTR, including the testimony of Finjan's technical expert, Dr. Eric Cole, that other systems rely on YARA rules stored in the SeeMore database and that lead to an increased detection of malicious code, and that this increase is the reason Blue Coat added the YARA rules. Trial Tr. at 553:22-554:10.

Finjan's experts, Drs. Cole and Dr. Medvidovic, testified that Webpulse processes more than 1.2 billion requests per day, and 80 million of those requests are processed by DRTR and Yara rules in the context of DRTR. Trial Tr. at 471:3-17, 482:6-23, 502:14-504:14, 916:15-23, 1059:9-1060:16; PTX-105; JTX-3050. Finjan also played the deposition testimony of Tyler Anderson, architect of GIN, who testified that Webpulse processes 1.2 billion worldwide requests. PTX-1281 at 70:14-19, 71:12-25. Finjan presented substantial evidence to support damages for the '844 and '494 Patents based on worldwide users of GIN/WebPulse. GIN and each of its components infringes the '844 and '494 Patents because it is made and used in the U.S. *Carnegie Mellon Univ. v. Marvell Tech. Grp. Ltd.*, 807 F.3d 1283, 1306-7 (Fed. Cir. 2015) (35 U.S.C. 271(a) "states a clear definition of what conduct Congress intended to reach—making *or* using *or* selling in the United States *or* importing into the United States, even if one or more of these activities also occur abroad").

As a preliminary matter, Blue Coat, in *Blue Coat I*, failed to make any argument that GIN/Webpulse was made outside of the United States until its post-trial motion, and the Court held that Blue Coat waived this argument. *Blue Coat I,* Dkt. No. 543 at 9-10. There are no new circumstances here since *Blue Coat I* that have changed the fact that GIN/Webpulse code is developed and compiled in the U.S. Importantly, Blue Coat did not appeal the Court's JMOL Order in *Blue Coat I* to the Federal Circuit, and is now collaterally estopped from arguing that Webpulse is not made in the U.S. Dkt. No. 276 at 22-23 (collaterally estopping Blue Coat from re-litigating the "identical" issues); *see also Roche Palo Alto LLC v. Apotex, Inc.*, 526 F. Supp. 2d 985, 995 (N.D. Cal. 2007), *aff'd*, 531 F.3d 1372 (Fed. Cir. 2008) (finding that issue preclusion (collateral estoppel) prevented accused infringer from re-litigating issues it previously raised and lost).

First, the substantial evidence at trial showed that GIN/WebPulse is made (compiled) in the U.S and infringes without the need for any additional components to be installed outside of the U.S. Under 35 U.S.C. § 271(a), "[w]hen [the accused infringer] made the [accused products] in this country, it infringed [the claim at issue] . . . [and] [w]hether those [accused products] were sold in the U.S. or elsewhere is therefore irrelevant . . . ." *See Card-Monroe Corp. v. Tuftco Corp.*, No. 1:14-cv-292, 2017 WL 3841878, at *43-45 (E.D. Tenn. Sept. 1, 2017) (quoting *Railroad Dynamics, Inc. v. A. Stuki Co.*, 727 F.2d 1506, 1519 (Fed. Cir. 1984) (holding that a royalty award could reach units made in the U.S.—valued at their sale price—regardless of whether they were sold abroad)); *see also Goulds' Mfg. Co. v. Cowing*, 105 U.S. 253, 256 (1881) (approving an award based on defendant's profits, reaching units made in the U.S. where some were to be used only abroad).

Software is made when the source code is compiled into a program. *CNET Networks, Inc. v. Etilize, Inc.*, 528 F. Supp. 2d 985, 994 (N.D. Cal. 2007). It was undisputed at trial that GIN/WebPulse is developed in the United States. Dkt. No. 424 at 11-12. Finjan presented the expert testimony of Dr. Medvidovic, relying upon Blue Coat documents and witness testimony, that Blue Coat makes and compiles in the United States GIN/WebPulse, including all of its subcomponents, and that all MAA code is made in and pushed out of the United States . Trial Tr. at 982:22-987:2; PTX-216. Another of Finjan's technical experts, Dr. Mitzenmacher, testified to the same. Trial Tr. at 765:10-12.

Finjan also offered further evidence through Dr. Cole, Blue Coat documents and Blue Coat witness testimony that all development, maintenance, enhancement, and work on GIN/WebPulse is done in Draper, Utah. Trial Tr. at 495:7-496:21; 536:6-10; PTX-216. Dr. Mitzenmacher also testified that the GIN/WebPulse product is developed in Draper, Utah, all GIN/WebPulse updates are pushed out of that location, and if the GIN/Webpulse service in Draper, Utah is shut down, GIN/WebPulse in its entirety would cease to function. Trial Tr. at 765:3-22. Furthermore, at trial, Finjan presented Blue Coat's responses to Finjan's requests for admission that GIN/WebPulse, including DRTR, is developed in the United States, and that updates for WebPulse, including DRTR, are pushed out of the United States. Trial Tr. at 889:9-23. Thus, Finjan presented substantial evidence at trial showing that all of GIN/WebPulse's source code is maintained in the U.S., it is compiled in the U.S., and all updates of

GIN/WebPulse are made in the U.S. and are pushed out to all of its data centers. Accordingly, every version of GIN/WebPulse running on any of Blue Coat's worldwide data centers are made in the U.S.

Second, Dr. Mitzenmacher also offered testimony and evidence that GIN/WebPulse used overseas is controlled by Blue Coat from the United States, and that Blue Coat's U.S. and worldwide users receive the beneficial use of GIN/WebPulse from the United States. Trial Tr. 1051:24-1055:20; PTX-52; *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005) ("The use of a claimed system under section 271(a) is the place at which the system as a whole is put into service, *i.e.*, the place where control of the system is exercised and beneficial use of the system obtained"); *Decca Ltd. v. U.S.*, 210 Ct. Cl. 546, 567-68 (Ct. Cl. 1976) (finding use in the United States of accused system where transmission from a Norwegian station was controlled by the U.S. in the sense that activity in the U.S. established and continuously monitored signals and ensured synchronization with the Norwegian station). Dr. Medvidovic also offered testimony and evidence that GIN/WebPulse used overseas is controlled by Blue Coat from the United States, and that Blue Coat's U.S. and worldwide users receive the beneficial use of GIN/WebPulse from the United States. Trial Tr. at 1051:24-1055:20; PTX-52. Finjan also presented substantial evidence that FRS, the component that infringes the '844 Patent is in GIN/WebPulse ,which is developed in the United States, and the results of the Malware Analysis Appliances are fed into FRS in the United States and for the benefit and use within the United States. Trial Tr. at 513:6-514:3; 529:9-532:18; 534:8-536:16; 916:15-918:2; 919:7-922:14; 981:23-982:16; 1042:3-18; 1043:11-19; 1051:24-1055:20; 1120:11-1120:21; JTX-3050; PTX-54.

Finjan also presented substantial evidence supporting a reasonable royalty premised on $8 per user. Finjan's President, Mr. Hartstein, testified that Finjan's licensing practices include an $8 per user rate, which is based on converting its 8-16% revenue based royalty rate established by its licensing practices to the paradigm of a user-based subscription model. Trial Tr. at 357:13-371:14, 371:19-392:15, 446:24-447:2. Mr. Hartstein testified that Finjan verified its $8 per user rate by looking at pricing structures, has experienced the $8 per user rate in its business, and uses the $8 per rate in negotiations when Finjan doesn't have access to the amount of money to apply its rates to or in a scenario where use of the technology has a greater value than that of just the revenues. Trial Tr. at

365:17-368:9. Dr. Meyer also explained that Finjan's $8 per user rate formed the basis of the jury's damages award in *Blue Coat I*. Trial Tr. at 1235:20-23.

While Blue Coat attempted to cross-examine Dr. Meyer that a 16% royalty rate for software is improperly based on a "25% rule of thumb," it was unable to successfully do so as the evidence was substantial at trial that the 16% was based on Finjan's longstanding licensing practices (Trial Tr. at 357:13-371:14, 446:24-447:2, 1290:16-1290:22, 1222:2-6); and also the jury verdict in *Sophos*, wherein the jury was presented with a 16% royalty rate on software and awarded damages in line with that rate. Trial Tr. at 1236:2-10. Mr. Hartstein testified that since the *Secure Computing* jury verdict where the 8% royalty rate for hardware and 16% royalty rate for software was used, Finjan consistently has used these rates in its licensing negotiations. Trial Tr. at 358:17-359:2. Dr. Meyer confirmed that she did not rely on the jury verdict in the *Secure Computing* case, but at the same time, acknowledged that the 8 and 16% royalty rates from the *Secure Computing* case were affirmed by the Federal Circuit and Finjan was paid $37.3 million based on the verdict in that matter. Trial Tr. at 1351:4-18.

Finjan's technical expert, Dr. Medvidovic, also testified regarding the technical advantages of the '844 and '494 Patents. Trial Tr. at 899:17-21, 1056:24-1070:17. He testified that Finjan's patented technology provide advantages in dealing with unknown threats, generating security profiles, recording and reusing security profiles, and assessing potentially malicious Downloadables at runtime. Trial Tr. at 1061:25-1067:14. In particular, Dr. Medvidovic testified that the technical advantages of the '844 Patent include: providing zero-day protection, increasing efficiency, permits offloading to the cloud and decreases expenses (Trial Tr. at 1062:15-1064:4) and the technical advantages of the '494 Patent include: increase speed and efficiency by storing the Downloadable security profile, proactive blocking of threats and reduction of costs. Trial Tr. at 1064:5-20. Dr. Medvidovic presented testimony that Blue Coat uses and benefits from this multi-faceted defense. Trial Tr. at 1069:7-1070:17.

Dr. Medvidovic also presented evidence and testimony at trial, including Blue Coat documents and witness testimony and the opinions of Finjan's technical experts, regarding the architecture of GIN/Webpulse and that FRS is one of the forty-six components of the GIN/Webpulse service. Trial

Tr. at 899:21-24, 1070:20-1072:25, 1080:12-1084:8, PTX-216; JTX-3043. Dr. Medvidovic testified that he assigned equal weight to each of these architectural components based on the principle in software engineering called abstraction and modularity that when you describe a system with its major building blocks, each system component is given equal weight. *Id.*; Trial Tr. at 1082:23-1084:8. Dr. Medvidovic also confirmed the absence of any evidence relating to a non-infringing alternative to Finjan's asserted patents. Trial Tr. at 1055:24-1056:4.

Blue Coat's damages expert, Mr. Thomas, failed to rebut Finjan's substantial evidence that it is entitled to a reasonable royalty. Mr. Thomas opined that the appropriate royalty rate to apply to revenues was 4-6% based on Finjan's patent license agreements with M86 that was executed years before the relevant hypothetical negotiation dates and Trustwave. However, Mr. Thomas admitted on cross-examination that the 4% royalty rate was applied to total revenues related to an OEM that was the "floor" and on top of what was already paid as part of the license fee in the initial agreement. Trial Tr. at 1892:13-1893:17, 1911:1-1912:13. He also admitted that there were rates of at least 8% in Finjan's patent license agreements dated around the times of the hypothetical negotiations. Trial Tr. at 1894:11-1897:2. He also agreed that the $8 per user was used in the *Blue Coat I* case and the royalty based on the $8 per user was upheld by the Court. Trial Tr. at 1892:6-12. Mr. Thomas also improperly failed to assess damages for each patent, and assumed that the '844 and '494 Patents covered the identical technology and treated them like they were one patent, despite the fact that he could not identify a single instance in which Finjan grouped two patents together and charged the same license amount for them. Trial Tr. at 1878:9-1879:3. He also mistakenly referred to Dr. Meyer's user-based method as an improper "reasonableness check" when the "reasonableness check" had been employed against Dr. Meyer's previous damages calculation of $23 million when additional products were accused of infringement in the case. Trial Tr. at 1890:13-1891:7.

Mr. Thomas did not have any opinion regarding a reasonable royalty for Blue Coat's infringement of the '844 Patent in which FRS is the infringing component at issue. He acknowledged during trial that he was not aware that FRS was infringing or alleged to be infringing at the time of his report. Trial Tr. at 1880:3-18. Mr. Thomas also acknowledged that there were no revenues for

GIN/Webpulse, that he used a proxy for what he called "GIN/Webpulse revenues" and Blue Coat calls GIN the center of the universe for all its products. Trial Tr. at 1884:1-1886:25. He also acknowledged that no Blue Coat witness testified that revenues for Webfilter and Intelligence Services represented the value of GIN. Trial Tr. at 1887:1-13.

Blue Coat also failed to present sufficient evidence to show there was any overlap between the damages the jury awarded in *Blue Coat I* and a reasonable royalty of damages that Blue Coat owes for infringement of the '844 Patent and '494 Patent in this case. Blue Coat failed to present any expert testimony at trial regarding whether the infringing technology from *Blue Coat I* was the same as the infringing technology in this litigation. Nor did Blue Coat's damages expert provide any opinions of what portion of damages, if any, overlap with damages from the previous litigation. Blue Coat's only purported evidence of overlap was the legally incorrect statement by a single fact witness, Mr. Schoenfeld, that it was his "understanding" that if the *Blue Coat I* verdict meant that Blue Coat would have the right to use the patents at issue in *Blue Coat I* through their expiration. Tr. at 1404:22-1405:4, 1406:9-14. However, on cross-examination, he admitted that Blue Coat knew it did not receive a portfolio license to all of Finjan's patents and the *Blue Coat I* verdict was limited to the specific products at issue in that case which are different from the products accused here. Trial Tr. at 1406:15-1407:5;1409:24-1410:16.

In fact, Drs. Cole and Medvidovic, experts who testified in *Blue Coat I*, testified at trial that the accused products were new and different from the infringing products in *Blue Coat I*. Trial Tr. at 471:3-17; 482:5-483:23; 486:19-487:23, 488:24-491:12, 496:25-497:3, 539:11-24; 542:14-24; 543:13-19; 547:3-13; 548:12-549:12; 551:1-23; 553:25-554:10; 555:12-25; 560:18-23; 587:21-25; 590:8-591:1; 595:1-14, PTX-211; PTX-516; JTX-3060; PTX-55; JTX-3043; JTX-3050. In this case, Finjan accused the new YARA rules in DRTR of infringing the '494 Patent, and the new FRS functionality in GIN of infringing the '844 Patent. It is undisputed that these were never accused of infringement in *Blue Coat I* and implemented in GIN/Wepbulse after that case.

Mr. Thomas, Blue Coat's damages expert, failed to provide any opinions at trial of what portion of damages, if any, overlapped with damages from the previous litigation. In fact, Mr. Thomas

used an even higher apportionment of GIN/Webpulse based on **6.7%** Webpulse traffic sent to DRTR, rather than the **2.7%** Webpulse traffic that Finjan's damages expert used. Trial Tr. at 1889:16-1890:12. For damages for infringement of the '494 Patent by GIN/WebPulse , as discussed above, Dr. Meyer excluded damages based on the 4% of traffic that was used to calculate damages in *Blue Coat I.* Trial Tr. at 1263:19-25. In sum, Blue Coat failed to present contrary evidence to rebut Finjan's evidence supporting damages, and, as a result, no reasonable jury could conclude that Finjan is not entitled to a reasonable royalty of at least $29.8 million for infringement of the '844 Patent and $16.2 million for infringement of the '494 Patent.

## VI. CONCLUSION

For the foregoing reasons, the Court should grant Finjan's renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) that (1) Blue Coat infringes the '844 and '494 Patents; (2) Blue Coat's infringement was and continues to be willful; and (3) Blue Coat owes damages of no less than a reasonable royalty for infringement of the '844 Patent and '494 Patent, i.e. $29.8 million and $16.2 million respectively.

Respectfully submitted,

Dated: December 15, 2017

By: */s/ Paul Andre*
Paul J. Andre (SBN 196585)
Lisa Kobialka (SBN 191404)
James Hannah (SBN 237978)
Hannah Lee (SBN 253197)
KRAMER LEVIN NAFTALIS & FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 752-1700
Facsimile: (650) 752-1800
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com
hlee@kramerlevin.com

*Attorneys for Plaintiff*
FINJAN, INC.